EUGENE A. MOHR, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 95235–95237. Filed March 31, 1966.

*W. T. Durant* and *Leslie C. Hackler, Jr.,* for the petitioners.
*Sidney B. Williams* and *Robert A. Roberts,* for the respondent.

HOYT, *Judge:* These consolidated proceedings involve deficiencies in income tax determined by respondent for the years 1957 and 1958 as follows:

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 95235 | Eugene A. Mohr | 1957 | $4,322.96 |
| 95236 | Eugene A. Mohr | 1958 | 5,401.20 |
| 95237 | Joyce Mohr | 1957 | 4,322.96 |

[5] The depreciation deductions disallowed under this issue are as follows:

| Fiscal year ended Jan. 31— | Depreciation disallowed on the ground that sales price exceeded adjusted basis at beginning of fiscal year | Depreciation limited to sales price |
|---|---|---|
| 1959 | $4,431.16 | |
| 1960 | 1,804.21 | $1,963.48 |
| 1961 | 1,075.98 | 4,444.52 |

[1] Proceedings of the following petitioners are consolidated herewith: Eugene A. Mohr, docket No. 95236; and Joyce Mohr, docket No. 95237.

Joyce Mohr is a petitioner herein solely by reason of her having joined with Eugene A. Mohr in filing a joint return for 1957. Because the deficiencies involved in these cases relate only to the income of Eugene A. Mohr, references hereinafter to petitioner in the singular shall be to Eugene A. Mohr.

The deficiencies as detailed above were determined on the theory that certain expenses paid by Mohr Buick Co. and claimed as its deductible travel and entertainment expenses were constructive dividends to petitioners to the extent of the corporation's earnings and profits. The original petition and answer filed in each of these consolidated cases dealt solely with the constructive dividend issue.

Subsequently, amendments to the original petitions were filed in each of the three docket numbers. Said amendments alleged that the petitioners were entitled to net operating loss carryback deductions for the taxable years 1957 and 1958 by reason of net operating losses allegedly incurred during the taxable years 1960 and/or 1961, and that, as a result of these carryback deductions, they were entitled to refunds of 1957 and 1958 taxes paid. Subsequent to the trial and submission of original briefs respondent filed a motion to strike the amendments to the petitions.[2] The parties submitted written memoranda and were heard in oral argument on this motion, which was subsequently denied.[3]

Thus, the pleadings, as amended, raise two questions for decision:

(1) Was petitioner, Eugene A. Mohr, in the business of buying and selling automobile dealerships during the years 1960 and 1961 so that he would be entitled to treat his losses in connection with these dealerships as ordinary losses deductible in full in those years in arriving at net operating losses which might be carried back to the tax years here in issue?

(2) Did petitioners receive constructive dividend income from Mohr Buick Co., Inc., in 1957 and 1958 by reason of disbursements of funds by said company designated as yacht, travel, and entertainment expense?

### FINDINGS OF FACT

Some of the facts have been stipulated; the written stipulation of facts and supplemental stipulation of facts, and exhibits referred to in each are incorporated herein by this reference.

Petitioners, Eugene A. Mohr, who resides in Dallas, Tex., and Joyce Mohr, who resides in Houston, Tex., were husband and wife on December 31, 1957, but were divorced on April 22, 1958. They

---

[2] This motion was made on the authority of *Yellow Cab Co.*, 43 T.C. 125 (1964), subsequently reversed and remanded by agreement of the parties, — F. 2d — (C.A. 7, 1965).

[3] The order denying this motion specifically reserved the right of respondent to renew the motion in his reply brief, however, it was not renewed.

filed a joint Federal income tax return for the calendar year 1957 with the district director of internal revenue, Dallas, Tex. Petitioner Eugene A. Mohr filed an individual income tax return for the calendar year 1958 with the same district director. Petitioner and Regina Mohr were subsequently married and they were husband and wife on December 31, 1960, and December 31, 1961. They filed joint returns for the calendar years ending on those dates with the Dallas district director.

Petitioner's father, E. B. Mohr, has been a General Motors dealer since 1929, and petitioner was raised in the business. Petitioner actively entered the automobile business in 1945 as personnel manager of Mohr Chevrolet Co. in Dallas, which company is presently owned by E. B. Mohr. In early 1955 petitioner owned 10 percent of Mohr Chevrolet Co.; in the spring of that year he sold this interest to his father for approximately $106,000.

After petitioner disposed of his interest in Mohr Chevrolet Co. he went to California in April or May of 1955 and applied for a Chevrolet franchise. A person who desires a franchise to sell Chevrolet automobiles submits an application for the franchise (sometimes referred to herein as dealership) to the zone manager for the Chevrolet Division of General Motors Corp. This application is later reviewed by the regional manager. Similarly, an application for a Buick franchise is submitted to the Buick Division zone manager. Chevrolet and Buick franchises are normally issued for specific periods of time, usually 5 years in the case of Chevrolet.

At all times here relevant General Motors adhered to a policy known as the chain dealership policy. Under this policy a franchised dealer would be permitted to acquire a second or additional franchise provided that he entered a contract with a third party applicant, approved by General Motors, to sell over a 5-year period either the original or the additional dealership to the third party. Under the policy a dealer theoretically could acquire several franchises provided that all but one of them were placed on a 5-year sellout agreement. The applicant participating with the chain dealer was required to have at least a 25-percent interest in the dealership. Customarily, a portion of the stock in the dealership corporation is purchased each year of the first 5 years by the applicant, the purpose being that the total buy-out of stock from the original investor is completed at the end of the fifth year.

While waiting for his California application to be processed petitioner attempted to obtain an Oldsmobile franchise in Dallas through negotiations with Carl Diest, the Oldsmobile regional manager in Dallas. Diest had petitioner's approved application for the new dealership with him when he was killed in an airplane crash. General Motors then appointed a new regional manager for Dallas and the

Oldsmobile dealership was subsequently assigned to an applicant other than petitioner.

After the negotiations for the Oldsmobile franchise in Dallas failed, petitioner received advice from California that the El Cajon Chevrolet dealership of San Diego was available for him. Petitioner secured a letter of intent from General Motors that this dealership franchise would be awarded to him; he was about to leave for California to take over the agency and arrange construction of a new building when he was requested by the General Motors representative to release the El Cajon dealership. On the basis of the representative's promise that he would secure another dealership for him, petitioner acceded to this request.

Petitioner was then directed by General Motors Chevrolet Division to the Jimmy Green Chevrolet Co. at Houston, Tex. Petitioner inspected that dealership, secured Chevrolet's approval for transfer of the franchise, and negotiated with the owner for purchase; however, the owner's income tax difficulties prevented him from passing good title to the dealership.

The Chevrolet Division then suggested that petitioner consider the Ornsby Chevrolet dealership in San Antonio. Petitioner inspected this dealership but decided it would be too expensive to fit into his plans; Ornsby had about $400,000 in shop tools in addition to the other assets which had to be purchased with the dealership.

Petitioner then learned that the Higginbotham Buick dealership in Houston was losing money, short of cash, and available; he investigated the situation and applied to General Motors for purchase approval. Petitioner was approved as a Buick dealer by General Motors, whereupon he traveled to Houston and negotiated the dealership's purchase from its owner. Petitioner chartered the Mohr Buick Co., a Texas corporation, on September 29, 1955; this corporation took over the operation of the Houston Buick dealership on October 1, 1955, on which date Buick Motor Division of General Motors granted the corporation the Buick franchise.

Mohr Buick Co. was capitalized for $100,000; petitioner contributed $75,000 for 75 percent of the stock and D. D. Ross contributed $25,000 for 25 percent of the stock. Ross, who was to be general manager and ultimate owner of the Buick agency, borrowed his part of the capital funds from Republic National Bank of Dallas, on petitioner's endorsement. A buy-out agreement was executed to allow Ross to buy petitioner's interest in Mohr Buick Co. over a period of 5 years.

Subsequently, in late 1955 or early 1956, Ross defaulted on his note at Republic National Bank and the amount of the note was charged against petitioner's account as endorser. As a result of Ross' default his stock in Mohr Buick Co. was canceled, and equivalent shares were issued to petitioner. In January 1956, Ross was relieved of his duties

as general manager; he was offered the position of sales manager but he declined and left Mohr Buick Co. A new manager to replace Ross was not obtained immediately and petitioner personally assumed the duties of general manager. Subsequently, O. A. Eversole became manager of Mohr Buick and entered into a buy-out agreement.

In October 1955, petitioner joined with Bob Erskine and Clem Ruh in attempting to secure a Chevrolet dealership in Kenner, a suburb of New Orleans. Bob Erskine was a friend of petitioner who had been assistant zone manager for Chevrolet before he obtained his own franchise in Beverly Hills. Clem Ruh was a general sales manager for a large Los Angeles dealership who was interested in a dealership of his own. Ruh was to be agency manager of the Kenner dealership, and a buy-out agreement was drafted which allowed him to buy out petitioner and Erskine within 5 years.

The parties actually received a letter of intent from General Motors; however, they abandoned the venture because they were unwilling to comply with the requirement in the letter of intent that they live in New Orleans for 6 months prior to its effective date and because in the course of negotiations they were offered a Chevrolet franchise in California.

At some time in late 1955 or early 1956, petitioner learned that Chevrolet Motor Division intended to open a new dealership in Woodland Hills which was near Canoga Park, Calif., and he felt that he had the "inside track" on being granted the new franchise. After surveying the area petitioner concluded that the proposed new agency would be better located at Canoga Park rather than Woodland Hills, and he persuaded the local zone manager to make this change. Petitioner then secured a letter of commitment for the Canoga Park dealership. Petitioner, Erskine, and Ruh formed a California corporation known as Clem Ruh Chevrolet Co. on or about February 21, 1956, to operate the new franchise. Petitioner and Erskine each contributed $23,437.50 to the corporation for equal interests in 75 percent of its stock, to be held in petitioner's name. Ruh subscribed to 25 percent of the corporation's stock. By check dated February 23, 1956, petitioner paid $23,437.50 for his 37½ percent of the Clem Ruh Chevrolet Co. stock. Erskine paid a like amount for his 37½ percent of the stock. A buy-out agreement between petitioner and Ruh was executed under which Ruh was to acquire all of the stock over a period of 5 years.

Clem Ruh Chevrolet Co. was successful and rapidly outgrew its initial facilities. Petitioner was active in arranging the acquisition and financing of new facilities. According to the buy-out agreement with Clem Ruh, petitioner was to serve as president of the corporation for $12,000 annual salary. He received this salary at least for each of the years 1957, 1958, and 1960, and split it with Erskine. Pursuant to the buy-out agreement between petitioner and Ruh, Ruh purchased

petitioner's stock in the corporation over the 5-year period specified therein. Ruh completed the purchase of petitioner's stock in January 1961. Petitioner reported the sale of his Clem Ruh Chevrolet stock on his returns for 1957, 1958, 1960, and 1961[4] as long-term capital gains in the following amounts:

| | |
|---|---:|
| 1957 | $2,982.15 |
| 1958 | [1]385.14 |
| 1960 | 1,432.99 |
| 1961 | 36,616.70 |

[1] $770.28 less $385.14 which was Joyce Mohr's community one-half.

On August 13, 1957, petitioner organized a Texas corporation called Southwest Isetta Distributors, Inc., to operate as a distributor in five States for the Isetta, a small foreign car. The corporation's general manager, without petitioner's approval, ordered an excessive number of these cars without first having established any dealer organization to dispose of them. Petitioner then tried to sell the distributorship and inventory to a group to be formed for that purpose; however, this group could not arrange the necessary financing and the venture collapsed.

On or about October 25, 1957, Mohr Chevrolet Co., Inc., of Houston was organized as a Texas corporation by petitioner. The corporate name was subsequently changed to Gene Mohr Chevrolet Co. Gene Mohr Chevrolet Co. received a General Motors franchise on November 14, 1957. Petitioner paid $125,000 for 100 percent of the Gene Mohr Chevrolet Co. stock.

At the time Gene Mohr Chevrolet was organized petitioner was the sole owner of Mohr Buick Co. since, as indicated above, the agreement between petitioner and D. D. Ross under which Ross was to buy out petitioner's interest in Mohr Buick had been terminated in early 1956. Hence, under the General Motors chain dealer policy, at the time petitioner received the Chevrolet franchise, he had to enter a 5-year sellout agreement with another person for either Mohr Buick or Gene Mohr Chevrolet. Petitioner therefore placed Mohr Buick Co. under a buy-out contract with O. A. Eversole, the man who had become manager of that company after the departure of D. D. Ross. Notwithstanding his agreement with petitioner to buy Mohr Buick Co. stock Eversole never bought a single share of stock pursuant to that agreement.

In addition to being sole stockholder of Gene Mohr Chevrolet, petitioner was an officer in that corporation and received the following salaries for the years 1957, 1958, and 1960:

| | |
|---|---:|
| 1957 | $6,000 |
| 1958 | 20,000 |
| 1960 | 17,500 |

[4] His 1959 return was not introduced into evidence.

Mohr Buick Co. was originally located in a leased building on Harrisburg Boulevard in Houston. When its lease expired it was not renewed since the construction of a new freeway had resulted in a substantial loss of traffic on Harrisburg Boulevard. On October 23, 1958, petitioner wrote L. D. Loggins, zone manager of Buick, a letter in which he requested Buick's permission to relocate Mohr Buick Co. temporarily at 416 West Southmore in Pasadena, Tex. Buick Motor Division granted this relocation request but only on a temporary basis; it also provided that Mohr Buick would have to "move back into Houston within a given period."

G. M. Management, Inc., which was solely owned by petitioner, obtained a lease on a building at 416 West Southmore, Pasadena, and subleased the premises to Mohr Buick Co.

On August 4, 1959, petitioner and Eversole formed a new Texas corporation called Gene Mohr Buick, Inc. (hereinafter sometimes called Gene Mohr Buick Co.). On August 11, 1959, petitioner and Eversole wrote to Leonard B. Lane, Buick zone manager, requesting a 5-year renewal of the Mohr Buick franchise. This letter stated in pertinent part as follows:

If it is possible to obtain a new 5-year contract based on the assumption that a new building will be erected and that we are required to sign the mortgage personally, we would desire to have the new contract issued in the name of Gene Mohr Buick in place of the present name of Mohr Buick Company, as we are desirous of limiting the liability of the Buick Corporation for other than Buick liabilities, brought about by a divorce settlement.

We presently have chartered a new Corporation in the State of Texas, the new Corporation entitled Gene Mohr Buick Company. The officers of the present Mohr Buick Company are E. A. Mohr, who owns 750 shares or 75% of the stock and O. A. Eversole, Vice-President General Manager, who owns 250 shares or 25% of the stock and Kermit Ewert who is Secretary-Treasurer and owns no stock. The new Corporation of Gene Mohr Buick Company will have the same officers and stockholders and the same distribution of stock. The net worth of the Corporation will be set up initially at $100,000. It is requested that the parties in Paragraph Third now presently signing the Mohr Buick contract be retained in the new Gene Mohr Buick contract.

A franchise was issued to Gene Mohr Buick Co. effective October 1, 1960. Petitioner was required to build new facilities for Gene Mohr Buick Co. in Houston; however, Eversole was unable to finance his share of the additional investment. Moreover, because of the current diminution in profits of Mohr Buick Co., Eversole had been unable to keep up with the terms of his buy-out agreement on that corporation's stock. His request that he be relieved from the buy-out contract was approved by Buick Motor Division. Petitioner was the only person designated in the franchise agreement to participate in management and/or ownership of Gene Mohr Buick Co. The Mohr Buick Co. franchise was canceled simultaneously with the issuance of the Gene Mohr Buick Co. franchise. Mohr Buick Co. was never in operation

after the Gene Mohr Buick Co. operations commenced. At some time not ascertainable from the record Mohr Buick Co. acquired all the stock of Gene Mohr Buick.

In addition to the automobile dealerships discussed above, petitioner organized at least two other corporations during the years in question. On September 17, 1956, he organized Allstates Loan & Investment Co., Inc., as a Texas corporation. This corporation was intended to be a finance company for the purchase of retail automobile paper, but it never actually went into business. G. M. Management, Inc., was organized by petitioner as a Texas corporation on December 15, 1958. It was intended to act as a holding company to handle leases and facilities for petitioner's dealerships.

In July 1957, Mohr Buick Co. purchased a Chris-Craft Cruiser manufactured at Algonac, Mich., for a price of approximately $100,000. This yacht was seagoing and required a crew of two. It was used by petitioner for the entertainment of both business and personal acquaintances. Some of the entertainment was related to the business of Mohr Buick Co., some to petitioner's other business ventures, and some was purely personal. The Gene Mohr Chevrolet Co. franchise was secured by petitioner on the back deck of the yacht. The yacht was sold in April of 1959.

In 1957 and 1958 Mohr Buick Co. distributed to petitioner the following sums which it designated as travel and entertainment expenses and yacht expenses:

| | Travel and entertainment expenses | Yacht expenses | Total distributed |
|---|---|---|---|
| 1957 | $1,870.42 | $4,586.88 | $6,457.30 |
| 1958 | 3,624.74 | 28,066.21 | 31,690.95 |

In his statutory notices of deficiency respondent determined that the following amounts so designated actually represented distributions of current earnings and accumulated surplus of Mohr Buick Co. to petitioner herein, taxable as dividends to him: 1957, $6,457.30; 1958, $9,108.

In the deficiency notice for 1958, the distributions totaling $31,-690.95 made that year were included in petitioner's income only to the extent of $9,108, the amount of Mohr Buick Co.'s accumulated earnings at the end of 1958.

In addition to his stock investments mentioned above, during the years 1959 and 1960, petitioner made a considerable number of loans and advances to the automobile agencies in which he was interested. He also personally guaranteed bank loans to the corporations, and in some instances was called upon to make good on these guarantees.

On or about April 20, 1959, Mohr borrowed $480,000 from Pacific

Finance Corp. Mohr's father, E. B. Mohr, was guarantor of Mohr's indebtedness to Pacific. E. B. Mohr was subsequently called upon to make good on the balance of the $480,000 indebtedness, which he did.

On April 22, 1959, Mohr lent Mohr Buick Co. $150,000 of the $480,000 which he received from Pacific Finance Corp. The $150,000 was paid to Mohr Buick Co. by a check dated April 22, 1959, issued on Mohr's special account at the First City National Bank of Houston. Mohr Buick Co. executed a note payable to E. A. Mohr for the $150,000 loan.

The $150,000 which Mohr lent to Mohr Buick Co. on April 22, 1959, represented Mohr Buick Co.'s outstanding indebtedness to Mohr as of that date.

Subsequent to the $150,000 loan to Mohr Buick Co. on April 22, 1959, Mohr made loans to Mohr Buick Co. totaling $60,000 as follows:

| | |
|---|---|
| June 30, 1960 | $20,000 |
| July 14, 1960 | 20,000 |
| July 20, 1960 | 10,000 |
| Aug. 1, 1960 | 10,000 |

On December 21, 1962, "Mohr Buick Company by E. A. Mohr, President, and E. A. Mohr Individually" executed a note for $7,141.17, payable to First City National Bank of Houston. This note represented a renewal of a loan previously made to Mohr Buick Co.

On April 26, 1963, "Mohr Buick Company, by E. A. Mohr, President, and E. A. Mohr Individually" executed a note for $22,525, payable to First City National Bank of Houston.

In addition to owning the majority of Mohr Buick Co., Inc., stock at all times, Eugene A. Mohr was president of that corporation and received a salary. During the years 1957, 1958, and 1960, Eugene A. Mohr received from Mohr Buick Co., Inc., amounts designated as salary and bonuses as follows:

| | |
|---|---|
| 1957 | $88,277.72 |
| 1958 | 22,250.00 |
| 1960 | 17,500.00 |

Eugene A. Mohr also received a salary of $4,300 from Gene Mohr Buick, Inc., in 1960.

Eugene A. Mohr was the guarantor of indebtedness of Mohr Buick Co. to Pacific Finance Corp. in the amount of $60,550.91. Neither Mohr Buick Co. nor Eugene A. Mohr has paid any part of this indebtedness to Pacific Finance Corp.

As of April 30, 1961, the total amount due Eugene A. Mohr from Mohr Buick Co. on notes was $152,250.

Eugene A. Mohr served as president of Clem Ruh Chevrolet Co., receiving a salary of $6,000 in 1957, $5,500 in 1958, and $6,000 in 1960. According to the buy-out agreement with Clem Ruh, Mohr was

to serve as president for $12,000 annual salary; this salary was split with Bob Erskine.

On April 22, 1959, Mohr lent Gene Mohr Chevrolet Co. $191,575 of the $480,000 which he received from Pacific Finance Corp. The $191,575 was paid to Gene Mohr Chevrolet by two checks drawn on Mohr's special account at the First City National Bank of Houston. Gene Mohr Chevrolet Co. executed a note payable to Mohr for $191,575.

The $191,575 which Mohr lent to Gene Mohr Chevrolet Co. on April 22, 1959, represented Gene Mohr Chevrolet Co.'s outstanding indebtedness to Eugene A. Mohr as of that date.

On March 16, 1960, Mohr issued a check to Gene Mohr Chevrolet Co. for $35,000 for which he received a note payable by Gene Mohr Chevrolet dated March 16, 1960, in the amount of $35,000.

On May 11, 1960, Mohr issued a check to Gene Mohr Chevrolet for $50,000 for which he received a note payable by Gene Mohr Chevrolet Co. dated May 12, 1960, in the amount of $65,000.

On June 3, 1960, Mohr issued a check to Gene Mohr Chevrolet Co. for $25,000 for which he received a note payable by Gene Mohr Chevrolet Co. dated June 3, 1960, in the amount of $25,000.

On September 16, 1960, Mohr received an additional 1,250 shares of Gene Mohr Chevrolet stock in exchange for the cancellation of the notes dated March 16, May 12, and June 3, 1960.

On December 15, 1960, Eugene A. Mohr lent Gene Mohr Chevrolet Co. $29,000. He received a note dated December 15, 1960, payable by Gene Mohr Chevrolet Co.

Gene Mohr Chevrolet Co. and Gene Mohr Buick Co. began to suffer business reverses and in 1960 petitioner attempted unsuccessfully to sell those corporations (along with Mohr Buick Co. which at that time owned all the stock of Gene Mohr Buick Co. but did not itself operate an agency).

In March 1961, General Motors canceled the Gene Mohr Chevrolet and Gene Mohr Buick Co. franchises, and in April 1961, applications for an arrangement were filed for both corporations under the provisions of chapter 11 of the Chandler Act.

In his income tax returns for 1957, 1958, and 1960, petitioner included no profit or loss from business (Schedule C). In 1957 he reported salaries and bonuses from the automobile dealerships and enterprises totaling $103,277.72; in 1958, $47,750 (less Joyce Mohr's community one-half of $11,125 on income received prior to divorce on Apr. 22, 1958); and in 1960, $45,300. His 1960 return included interest from Gene Mohr Chevrolet and Mohr Buick Co. totaling $22,063.99, which was reported as nonbusiness income. His 1960 return showed no net operating loss and no deductions for bad debts or worthless investments; interest related to the financing of various

enterprises promoted by petitioner was taken, together with interest incurred on debts for personal purposes, as a nonbusiness interest deduction.

In his 1961 return petitioner reported expenses "in connection with taxpayer's business of buying, selling, and operating automobile dealerships" totaling $15,158.41. He reported no income from the alleged "business" (though he reported as nonbusiness long-term capital gain, $68,491.70 from the sale of Clem Ruh Chevrolet stock in 1961), and showed a net Schedule C business loss of $15,158.41.

Petitioner filed an amendment to his petition in docket No. 95235 stating as follows:

Petitioner's 1960 income tax return reflects taxable income of $36,163.54 but does not include losses in the amount of $258,089.54 which Petitioner experienced, in connection with his business of promoting, organizing, financing, operating and dealing in business enterprises, in 1960 and/or 1961 due to business bad debts arising from loans to the various business enterprises connected with Petitioner's business. Neither does the 1960 income tax return reflect ordinary losses in the amount of $400,000.00 from stock investments, in various corporations which Petitioner promoted, organized, financed, and operated, and which investments became worthless in 1960 and/or 1961.

Identical amendments were filed in docket Nos. 95236 and 95237 except that the first line was changed to read: "Petitioner's 1961 income tax return reflects a loss of $5,387.85 * * *."

Respondent's answers to these amendments generally denied the allegations made by petitioner.

OPINION

The principal issue for decision here is whether petitioner incurred net operating losses in 1960 and/or 1961 which can be applied as a net operating loss carryback deduction against income reported for 1957 and/or 1958.

Section 172(b)(1) of the Internal Revenue Code of 1954 provides that net operating losses occurring in years subsequent to December 31, 1957, may be carried back to each of 3 taxable years preceding the taxable year of such loss. A net operating loss is defined by section 172(c) as the excess of deductions allowed by chapter 1 of the Code over the gross income. Section 172(d)(4), however, specifically provides that in computing the amount of a noncorporate taxpayer's net operating loss carryback deduction, deductions which are not attributable to the taxpayer's trade or business "shall be allowed only to the extent of the amount of the gross income not derived from such trade or business." Thus, to the extent that a net operating loss is not attributable to the operation of a trade or business of a noncorporate taxpayer it may not be carried back to preceding years.

Petitioners in the instant case seek a net operating loss carryback

deduction for losses and bad debts which petitioner allegedly incurred in connection with Mohr Buick Co. and Gene Mohr Chevrolet Co., two corporations in which he was majority stockholder. It has long been established that the business of the corporation is not the business of the stockholder. *Burnet* v. *Clark*, 287 U.S. 410 (1932); *Dalton* v. *Bowers*, 287 U.S. 404 (1932). Thus, if a stockholder seeks to establish that he incurred business bad debts and business losses as a result of his activities with the corporations, he must establish that he was engaged in a trade or business separate from the corporation and, moreover, that those activities were proximate to the separate trade or business. Furthermore, the courts have consistently held that a shareholder cannot obtain a business bad debt deduction by claiming to be engaged in the business of investment for profit. *Higgins* v. *Commissioner*, 312 U.S. 212 (1941); *H. Beale Rollins*, 32 T.C. 604 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960), and cases cited therein at page 615.

We have set out in detail and at some length the facts related to petitioner's automobile dealership ventures. We are convinced that these facts do not indicate that petitioner was in the business of buying and selling dealerships; rather, it is apparent to us that petitioner's activity amounted to investing in automobile dealership businesses.

Petitioner acquired interests in four dealerships: Mohr Buick, Clem Ruh Chevrolet, Southwest Isetta, and Gene Mohr Chevrolet.[5] Of these four, only one, Clem Ruh Chevrolet, was successfully sold. Southwest Isetta was sold when it ran into business difficulties, and there is no evidence that it was developed by the petitioner with the intention of reselling it. The other two dealerships went into bankruptcy. This is hardly the degree of buying and selling activity which one could comfortably label as the carrying on of a business of trading in dealerships; it was not sufficiently extensive to warrant the conclusion that the individual involved is more than a passive investor. In this respect the facts here are clearly distinguishable from the situations presented in the two cases heavily relied upon by petitioner, *Giblin* v. *Commissioner*, 227 F. 2d 692, 696 (C.A. 5, 1955); and *Ralph Biernbaum*, T. C. Memo. 1963–210. Although petitioner did investigate many more dealerships than the four he actually became financially involved with, most of the investigations which did not work out were made prior to or about the time petitioner secured his *first* franchise. Since petitioner testified that Chevrolet franchises were difficult to get and not often available, petitioner's initial investigation of several dealerships could just as likely have been a search for an investment (a business of his own) rather than, as petitioner contends, a search for an inventory of dealerships which might be acquired at a

---

[5] Gene Mohr Buick is not regarded as a separate venture since the facts show that it was merely the successor to the business of Mohr Buick Co.

bargain price for later resale. His own testimony at the outset indicates this. He wanted "to own a string of deals" during his lifetime; he wanted "to have two of them, at least," by the time he was 35. Clearly, petitioner started out to invest in his own automobile dealerships, not in any business to buy and sell or deal in such enterprises.

Petitioner claims that he was not just an investor since in order to get a General Motors franchise under the chain dealer policy he had to contract to sell out each additional one acquired or the one originally owned within 5 years. Thus, at the very outset he knew that he would have to resell, and this is inconsistent with an investment motive since investment implies an intent to hold indefinitely. As appealing as this argument sounds on its surface, its merit is but skin deep. The fact of the matter is that a 5-year sellout agreement was a necessary incident, under the General Motors chain dealer policy, to any investment in a General Motors dealership beyond the first. Thus, the entering into such an agreement does not belie the investment motive, it simply means that the chain dealer is willing to make an investment which must be limited to a 5-year term. The prospect of receiving the business profits for 5 years and/or selling out at a book value which exceeds cost are typical investment objectives.

The Supreme Court has recently considered the question of when a taxpayer is conducting a business as opposed to an investment program. *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858 (1963). The following language from *Whipple* is very significant to our analysis of the instant case (p. 202) :

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, *this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.* When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and *the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation.* [Emphasis supplied.]

Of key significance is the fact that the price at which petitioner contracted to sell out his dealership interests, under the chain dealership policy, was fixed at book value. Thus, petitioner's profit on selling a dealership was based upon and limited to increases in book value. Increases in book value could result only from earnings retained in the business.[6] If petitioner were able to sell for a price based on book value which was higher than his book value cost, the profit would represent merely the ultimate realization by him of profits earned by

---

[6] Petitioner has neither contended nor shown that his cost in a dealership was less than book value at the time of acquisition.

the dealership and retained in the business during the course of his ownership.[7] This is more in the nature of a return on investment than a profit from trading in dealerships. In words of the Supreme Court, "the return to the taxpayer * * * legally arises not from his own trade or business but from that of the corporation." *Whipple* v. *Commissioner, supra* at 202.

Petitioner testified also that after he originally left his father's business in order to go into business for himself, he was engaged in buying and selling automobile dealerships, and that throughout the years and the ventures described in our findings he considered himself as engaged in such a business. This testimony, however, is but one side of the Janus-faced posture in which petitioner finds himself in this case. We deem it significant that throughout the years in question, when he was in the process of successfully selling out his interest in Clem Ruh Chevrolet at a profit, petitioner never characterized himself for annual Federal income tax purposes as engaged in the business of trading in dealerships. In his income tax returns for 1957, 1958, and 1960 petitioner included no profit or loss from business (Schedule C). In his 1960 return interest received from Gene Mohr Chevrolet and Mohr Buick was reported as nonbusiness income, and interest expense claimed in petitioner's testimony to have been paid in connection with his alleged "business" was deducted as a nonbusiness itemized deduction. Also, significantly, petitioner reported the sale of his Clem Ruh Chevrolet stock in 1957, 1958, 1960, and 1961 as long-term capital gain. Finally, in his 1961 return petitioner reported expenses "in connection with taxpayer's business of buying, selling, and operating automobile dealerships" totaling $15,158.41. He reported no income from the alleged "business" (though he reported as nonbusiness long-term capital gain, $68,491.70 from the sale of Clem Ruh Chevrolet stock in 1961), and showed a net Schedule C business loss of $15,158.41. Thus, the evidence is convincing that petitioner turned from an investor to a trader with the arrival of losses. Such a metamorphosis undermines petitioner's self-serving testimony that right along he was engaged in the business of buying and selling automobile dealerships.

We hold that petitioner was not engaged in the business of dealing in business enterprises and, therefore, did not incur net operating losses in 1960 or 1961 which may be applied as net operating loss carryback deductions against the 1957 or 1958 income of petitioners Eugene A. Mohr and Joyce Mohr. The losses here involved arose from petitioner's activities as an investor concerned with and partici-

---

[7] We note in passing that such an investment appears to be an attractive one from the tax standpoint in that the return to the investor is realized as capital gain over the 5-year sellout period as payments are received from the purchaser. Petitioner in fact reported his gains from the sale of his interest in Clem Ruh Chevrolet as long-term capital gain over the years of receipt.

pating in the conduct of the corporate businesses. His income was not received directly for his own services but rather indirectly through the corporate enterprises which he served as officer-employee. No intention of developing the corporations as going businesses for sale to customers in ordinary course was shown but rather all of the evidence convinces us that petitioner entered into the various businesses here involved with intentions of owning and operating them and of earning his salaries therefrom and realizing profits on his respective investments. It was not until some of the ventures began to go sour that he came to the hindsight view that it might be to his tax advantage to become a buyer and seller of automobile dealerships in that "business." Under such facts he cannot claim that his losses on loans or investments in later lean years, which he herein seeks to carry back, were business bad debts. *Whipple* v. *Commissioner, supra.*

Having decided that the claimed losses were nonbusiness losses, we need not discuss respondent's alternative contention that the losses (based on bad debts and worthless stock) did not arise in 1960 as alleged by petitioners in their amended petitions.

The second issue in this case concerns the amounts paid by Mohr Buick Co. designated as yacht expenses and travel and entertainment expenses, which the respondent has determined should be treated as dividend income to petitioners.[8] It is fundamental that where funds of a corporation are disbursed for the personal use or economic benefit of a stockholder or his immediate family, there being no intention of repayment, the amounts so disbursed are either the equivalent of corporate distributions or additional compensation for services, especially in the case of dealings between closely held corporations and their stockholders. *Alex Silverman,* 28 T.C. 1061 (1957), affd. 253 F. 2d 849 (C.A. 8, 1958).

As to the yacht, the evidence indicates that it was used not only for the business entertaining of Mohr Buick Co. but also for the entertainment of persons associated with petitioner's other ventures and for personal entertaining by petitioner. Yacht expenses paid by Mohr Buick would represent taxable income to petitioner to the extent the expenses were those of the petitioner and not of Mohr Buick. The record does not indicate whether the amounts paid by Mohr Buick which the respondent has determined to be dividend income to petitioner represented the entire cost of operating the yacht for the respective years involved. If these amounts represented the entire cost of operating the yacht, respondent would be incorrect in attributing the *entire* amounts as dividend income to petitioner—since at least some portion of the yacht expense was incurred for the benefit

---

[8] It is not disputed that to the extent these distributions were included in petitioner's income by respondent, Mohr Buick Co. had current or accumulated earnings and profits.

of Mohr Buick and not petitioner. However, petitioner has failed to show that this was the case [9] or that any portion of the yacht expenses paid by Mohr Buick and attributed as dividend income to him was actually paid for the benefit of Mohr Buick.

Petitioner's principal argument with respect to the yacht expenses is that to the extent expenses paid by the corporation are determined to be expenses of petitioner, they are deductible by him as expenses of his trade or business of buying and selling automobile dealerships. Since we have already held that petitioner was not engaged in such a business for tax purposes, it must follow that yacht expenses were not deductible by him and respondent's determination with respect to yacht expenses must be sustained.

Petitioners have introduced no evidence, nor have they presented any argument on brief, with regard to respondent's determination that moneys distributed as alleged travel and entertainment expense by Mohr Buick Co. constituted dividends to petitioners. Hence, respondent's determination must be sustained.

*Decisions will be entered for the respondent.*

---

[9] And, although the record is not entirely clear on the matter, it tends to indicate that this was *not* the case, and that the yacht expense attributed as dividend income to petitioners was substantially less than the total cost of operating the yacht.

