James D. Bowman and Merle C. Bowman v. Commissioner. Mid-South Engineering Company, Inc. v. Commissioner.Bowman v. CommissionerDocket Nos. 7126-65, 7127-65.United States Tax CourtT.C. Memo 1969-23; 1969 Tax Ct. Memo LEXIS 276; 28 T.C.M. (CCH) 109; T.C.M. (RIA) 69023; January 30, 1969, Filed Clyde W. Key, Bank of Knoxville Bldg., Knoxville, Tenn., for the petitioners. Charles G. Barnett, for the respondent. TIETJENSMemorandum Findings of Fact and Opinion TIETJENS, Judge: In these consolidated proceedings, the Commissioner determined income tax deficiencies and additions to tax as follows:Additions to TaxDocketTaxable YearSec. 6653(a),PetitionerNo.EndingDeficiencyI.R.C. 1954James D. and Merie C.7126-6512/31/58$ 18,495.77 Bowman12/31/5979,395.4612/31/6058,588.4412/31/6143,389.5612/31/6261,498.96Mid-South Engineering7127-653/31/60220,197.56$ 11,925.16 Company, Inc.3/31/62100,011.615,000.58 Due to concessions, only the following issues remain: (1) Whether the costs incurred in the operation*277 and maintenance of a stable of show horses are deductible by Mid-South Engineering Company, Inc. (hereinafter sometimes referred to as M-S.E.) as ordinary and necessary trade or business expenses under section 162, I.R.C. 1954; if not, (2) Whether these expenses constitute constructive dividends to James D. Bowman, the sole shareholder of M-S.E.; and (3) Whether any part of the underpayment of M-S.E.'s income tax was due to negligence or an intentional disregard of rules and regulations so as to make section 6653(a), I.R.C. 1954, applicable. Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. James D. and Merle C. Bowman are husband and wife who resided in Knoxville, Tennessee at the time they filed their petition herein. They filed timely joint Federal income tax returns for the taxable years 1958, 1959, 1960, 1961, and 1962 with the district director of internal revenue, Nashville, Tennessee. As Merle C. Bowman is a party to these proceedings solely by reason of having filed joint income tax returns with her husband for the years*278 at issue in these proceedings, James D. Bowman will hereinafter sometimes be referred to as the "individual petitioner" or "Bowman." Mid-South Engineering Company, Inc., hereinafter sometimes referred to as the "corporate petitioner" or "M-S.E.," is a corporation organized under the laws of the State of Tennessee with its principal office in Knoxville, Tennessee. M-S.E. maintains its general books and records on the accrual method of accounting. M-S.E.'s first year of operation was the fiscal year ending March 31, 1958, and thereafter the corporate petitioner timely filed corporation income tax returns for fiscal years ending March 31, 1959, 1960, 1961, 1962, and 1963 with the district director of internal revenue, Nashville, Tennessee. Bowman was president, director, and the sole stockholder of M-S.E. for all years at issue herein. As president of the corporate petitioner, the individual petitioner received 111 an annual salary of $ 36,000 for each of these years. At the time of the trial, the individual petitioner was 55 years old and his educational experience included high school and two quarters at the University of Tennessee. Prior to his organization of M-S.E., Bowman*279 was in the business of constructing sewers, pipelines, street paving, airports and highways with most of his prior work being done in the immediate vicinity of Knoxville, Tennessee. Mr. Bowman was not a professional engineer. For all the years in issue, all of the engineering work performed by M-S.E. was done in connection with projects in either Tennessee or Alabama with the exception of minor contracts in Georgia and Florida. During these years, M-S.E. was engaged primarily in the business of providing professional engineering services to state, county and municipal governments on a contract basis. The corporate petitioner does not, and never has, engaged in actual construction work. Approximately 90 to 95 percent of the work performed by M-S.E. is performed for public authorities such as Federal, state or municipal governments. Ordinarily, before an engineering company is employed by a governmental body to perform services, the engineering company must first be placed on the governmental body's eligibility list. The requirements for the entry of a professional engineer's name on the eligibility lists of the various states differ among states. Outside the State of Tennessee, *280 the corporate petitioner was listed on the eligibility lists of the states of Kentucky, Alabama and Florida, during the years involved herein. The corporate petitioner, however, was not on the eligibility lists of either North or South Carolina, Georgia, Virginia or West Virginia nor had it applied for entry on the eligibility lists of any of those states. During these years M-S.E., but not Bowman individually, was a member of the Tennessee Society of Professional Engineers. The code of ethics of the Tennssee Society of Professional Engineers prohibited a professional engineer from obtaining employment by way of competitive bidding. Thus, contracts for professional engineering services were entered into through negotiation between owner or governmental body and an engineering firm. The normal procedure is for a governmental body seeking the services of a professional engineer to call in an engineer whose name is on the particular body's eligibility list to discuss the various aspects of the project in question with the engineer. After this is done, it is considered improper for any other professional engineer or engineering company to enter into any kind of agreement or to approach*281 the governmental body until such time as the first engineer has been rejected by the governmental body. The canons of ethics of the Tennessee Society of Professional Engineers provide that a professional engineer must not advertise his work in a self-laudatory manner and must avoid all conduct or practice likely to discredit or do injury to the dignity and order of his profession. In March of 1959, Bowman transferred 15 horses which he had previously acquired, to M-S.E. The horses were entered on M-S.E.'s books and records at an inventory value of $10,065. At the same time, certain stable equipment owned by Bowman was also transferred to M-S.E. and recorded on the corporate petitioner's books at an inventory value of $3,394.36. The horses and equipment had been purchased by the individual petitioner over a period of several months prior to their transfer to M-S.E. From August of 1958 until June of 1959, Bowman's horses were kept at the stables of Mr. Harold Sherrill. During this period, also, Mrs. Harold (Katherine) Sherrill began to teach Bowman's daughter, Libby, how to ride, an activity in which Libby became proficient. Sometime during the fiscal year ending March 31, 1960, approximately*282 50 acres of land, stables and farm buildings were acquired by and entered on the books and records of M-S.E. in the amount of approximately $35,500. At that time the land was located on the outskirts of Knoxville, Tennessee. The horses, eguipment, land, stables and farm buildings described above are hereinafter referred to as Mid-South Stables. Since April of 1959, Katherine Sherrill (hereinafter referred to as Katherine) has been employed to run Mid-South Stables. Katherine had been connected with the horse show business since about 1935. She had worked at training juvenile and amateur riders and had some experience in managing stables. She was not familiar with the economics of horse raising, and at the time she was hired, Katherine did not discuss with Bowman the profit potential or the probable costs of horse raising. Katherine did not estimate the number of horses the stables would have to raise in order to 112 cover the costs of operation, nor did she prepare a budget for the stable operation. Further, she was not told by Bowman how much money she could spend on those operations. At the time Bowman decided to have M-S.E. acquire the stables and farm he had not made any*283 investigation as to the profit potential in raising and breeding horses. During the years in issue, Mid-South Stables entered its horses in many shows and won many events. At these shows, Bowman met and associated with numerous people. Bowman believed his acquaintance with these people might be beneficial for his business, as some of them were in some manner connected with state and county agencies that might seek engineering advice from M-S.E. The following is a list of the horse shows and sales to which Mid-South Stables took its horses during the years in issue: 1959February 4Dinner Key ShowFebruary 18So. Miami ShowFebruary 19Gainsville ShowFebruary 25Largo ShowMarch 2TampaApril 1Lexington Tattersall SaleApril 25Chattanooga ShowApril 29Kansas City SaleMay 23Hall's Tenn. - ShowMay 24Harrodsburg, Ky. - Bought Top Brass and gaited ponyJune 5Powell Horse ShowJune 6Lenoir City Horse ShowJune 12Knoxville Horse Show (Riding Club)July 4Etowah Horse ShowJuly 11Loudon Horse ShowJuly 30Blowing Rock ShowAugust 22Gibbs Horse ShowAugust 25Lewisburg, W. Va. ShowSeptember 12Sweetwater Horse ShowSeptember 14Fair Horse Show, KnoxvilleNovember 9Montgomery, Ala. Show1960January 15Boyton Beach, Fla.January 24Miami Dinner Key ShowFebruary 19Winter HavenFebruary 21TampaApril 3Awards Banquet OrlandoMay 4Columbia, S. C. Horse ShowMay 15Cas Walker Show at Cas Walker StableMay 28Powell Horse ShowJune 24Knoxville ShowJuly 30Gibbs ShowAugust 23W. Va. State Fair Horse ShowOctober 22Huntington, W. Va. - traded pony for mare1961April 21Dogwood Arts ShowApril 29Chattanooga ShowAugust 31National CelebrationSeptember 7Knoxville Fair Horse ShowOctober 13Chattanooga Horse Show1962April 4Lexington SaleApril 26Knoxville Horse Show (Riding Club)August 19MaryvilleAugust 19Oak RidgeSeptember 6Knoxville - Fair - Show1963April 10Mrs. Sherrill, Cas Walker Tat- tersall SaleApril 18Knoxville Riding Club ShowApril 16Greenville, S.C. Horse ShowJuly 21Loudon Horse ShowSeptember 19Knoxville - Fair - ShowNovember 26Miami Show*284 Expenses incurred and paid in connection with the care, maintenance, training, transportation and showing of the horses owned by Mid-South Stables were deducted, for Federal income tax purposes, by M-S.E. The following schedule outlines the expenses so incurred, paid and deducted during the corporate petitioner's fiscal years ending in 1959 through 1963: Fiscal Year Ended March 3119591960196119621963Feed & Board$1,160.00$ 6,719.35$2,695.55$3,255.09$3,154.73Insurance1,325.001,809.733,232.093,237.4450.00Repairs & Expense1,181.481,846.461,313.181,267.77Travel & Show5,429.2532,710.542,766.843,567.32 ExpensesAll Others1,179.8217,440.388,566.913,725.739,214.49Salaries & Wages24,691.6019,217.5024,741.2925,928.15Cost of Horses3,990.00510.00Depreciation18,921.1317,185.4611,197.826,080.35Total Expenses$10,275.55$108,129.19$55,487.53$50,992.46$44,427.72The schedule below outlines the income reported by the corporate petitioner from its stable operation during the years at issue herein. 113 Fiscal Year Ended March 3119591960196119621963Income:Sale of Horses$ 5,365.00$5,295.62$1,610.00$1,500.00Prizes1,952.5080.00Pasture Rent118.00165.00Hauling100.00Misc. Adjustments373.00Sale of Supplies73.50Total Income$ 7,317.50$5,667.12$1,775.00$1,873.00Less Cost of Sales1,000.002,000.00Gross Profit$7,317.50$5,667.12$775.00($ 127.00)*285 The following schedule reflects a conversion of the net stable expenses paid by the corporate petitioner during each fiscal year from a fiscal year basis to a calendar year basis: Total Net Expenses ProratedTotal NetNet Expenses PriorNet Expenses Subse-Year EndedExpenseto 12/31quent to 12/3163-31-59$ 10,275.55$ 7,706.66$ 2,568.893-31-60 *100,810.5275,607.8925,202.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,820.4137,365.3112,455.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,217.4637,663.1012,554.363-31-63 44,554.7233,416.0411,138.68$255,678.66$191,759.00$63,919.66Total Net Expenses on a Calendar Year BasisYearAmount1958$ 7,706.66195978,176.78196062,567.94196150,118.20196245,970.40* The parties have stipulated the total $100,810.52 as the net expenses for Mid-South Stables for the year ending March 31, 1962. However, income and expenses stipulated for Mid-South Stables for this year do not net out to this amount but rather to $100,811.69. For purposes of this opinion, we shall regard the first total ($100,810.52) as being correct. During the years in issue herein, M-S.E. reported on its tax return*286 the following amounts: Net Income (Loss)Taxable IncomeFiscalFrom Operations(Loss) 1 BeforeYearExclusive ofNet OperatingEndedStable Ex-Loss Deduc-Mar. 31pensestion1959$ 82,253.91$71,978.36196037,430.52(63,380.00)(49,820.41)196243,953.83(6,263.63)1963144,316.6099,761.88During the years in issue, additional horses were acquired and listed as assets of M-S.E. Bowman's daughter, Libby Bowman (hereinafter referred to as Libby), during the years in question became an outstanding horsewoman, an accomplished ice skater and an excellent swimmer. Prior to the purchase of Mid-South Stables, Katherine was in the process of training Libby to ride. After the purchase of the stables and the hiring of Mrs. Sherrill as its manager, Katherine continued teaching Libby, providing all of Libby's training. In this regard, Katherine spent in excess of 1,000 hours with Libby. Libby showed a great deal of enthusiasm for horses and was also a very dedicated student. In Katherine's opinion, Libby was one of the most outstanding pupils that she*287 had ever had. During the period involved herein, the horse shows Mid-South Stables entered in Tennessee, Alabama, Florida, North Carolina, South Carolina, Kentucky and West Virginia, were ones in which Libby rode 114 primarily. Mid-South Stables would normally transport 6 to 8 horses to these shows in a luxury liner, 9-horse, tractor-trailer van. The van was one of the best and cost approximately $23,000. "Mid-South Stables" and Libby's names were displayed prominently on the van, and on other Mid-South Stables equipment. Libby Bowman would ride approximatcly 3 to 5 Mid-South Stable entries at each of these shows; and sometimes, in shows lasting 4 or 5 days, she would be entered approximately 20 times. She would usually ride a different horse on a number of these occasions and often won her event. In the July 1959 edition of Saddle and Bridle, Mid-South Stables obtained a page in the magazine's "Under Twenty-One" section. The magazine every year picked out children who had done best in their division and invited them to have their pictures in the "Under Twenty-One" section. The page was purchased by Mid-South Stables and contained a picture showing Libby and some of her trophies. *288 The page also contained the following inscription: Miss Libby Bowman and her array of trophies, all of them won in five short months of showing. This fine young horsewoman is the daughter of Mr. and Mrs. Dave Bowman of Knoxville, Tennessee [and] has been taught skillfully [sic] riding by the one and only Katherine Sherrill. This poised unafraid child has mastered the technique of good feet and good hands and good handling of horses in such a short time. Libby has tasted the sweetness of blue ribbons due to some of her impressive shows of the South and are to date almost fantastic. Her future seems to be strewn this year with roses and winnings which are likely to be unexcelled by a nine year old. Libby is a great lover of the outdoors and animals. With her in this photograph are her two toy poodles, Pepper and Gee Gee. In October of 1959, the individual petitioner also appeared in photographs that were published. One picture was taken with the Governor of West Virgina and a roadster pony owned by Mid-South Stables. The caption of the picture, which was made in Lewisburg, West Virginia, reads: "Mid-South Stables of Knoxville, Tennessee scores again. Owned by Mr. and Mrs. Dave*289 Bowman." In the December 1959 edition of the magazine Saddle and Bridle there appeared a "Christmas card" in the form of an advertisement which had been purchased by Mid-South Stables. The "Christmas card" bore the heading: "Merry Christmas from Libby Bowman and the entire staff of Mid-South Stables, Knoxville, Tennessee." The "Christmas card" also contained a picture of Libby riding a quarter pony. An inscription under the picture read: Libby in her formal pose with her pleasure pony, My Little Chum, [a] quarter horse pony which is very dear to her heart. Libby is the 10 year old daughter of Mr. and Mrs. Dave Bowman, who shows with distinction all of the 5 champion horses and ponies from their Mid-South Stables. She is a real little queen of the tanbark and will be seen in the coming Sunshine Circuit with these and other high steppers who will be shining throughout the South and Southwest this season. She will no doubt add much glamour and competition to these realms of gaiety and colorful shows. In the program of the Knoxville Spring Horse Show that was held in June of 1966, Mid-South Stables purchased a page which was headed "Mid-South Stables Presents" and bore the caption*290 "Libby and her Wild Dream, defeated only once in two years." In the February 1966 issue of Saddle and Bridle, Mid-South Stables purchased a fourpage advertisement which prominently featured the stables' stud horse Galeway. The advertisement also identified Mr. Dave Bowman as the owner of Mid-South Engineering and Katherine Sherrill as manager of Mid-South Stables. The advertisement further stated: Mid-South Engineering Company is pleased to announce the appintment of Jack Coats as their new trainer. Mr. Coats will join manager Katherine Sherrill to further promote and establish a strong string of competitive show horses. Relatively dormant for the past several years, Mid-South will soon be back in the winners spotlight. Bowman and his wife have two sons who during the years involved also showed the horses of Mid-South Stables occasionally. The fair market value of the land and improvements of Mid-South Stables was $97,000 on January 28, 1967. The Commissioner, in the notice of deficiency sent to M-S.E., disallowed the stable expenses claimed by M-S.E. and stated: In the return [for the fiscal year ending March 31, 1960] a loss from stable operations of $100,810.52 [$49,820.41*291 for F.Y.E. March 31, 1961; $50,217.46 for 115 F.Y.E. March 31, 1962; and $44,554.72 for F.Y.E. March 31, 1963] was deducted. It is determined that the deduction is unallowable as you have failed to establish that the loss was related to or sustained from the carrying on of a trade or business. Accordingly, taxable income is increased by $100,810.52 [$49,820.41, $50,217.46, and $44,554.72]. Accordingly, in the notice of deficiency sent to Bowman, the Commissioner increased Bowman's tax liabilities including in his taxable income additional amounts which represented the disallowed stable expenses for these years. The Commissioner designated these as "payments by [Mid-South Engineering Company, Inc.] on your behalf." Ultimate Findings of Fact The expenses incurred in the operation and maintenance of Mid-South Stables were not ordinary and necessary trade or business expenses of M-S.E. These expenses were incurred primarily for the personal enjoyment of its sole shareholder, Bowman, and are includable in Bowman's income as dividends. M-S.E.'s underpayment of tax was due to its failure to exercise reasonable care. Opinion Trade or Business Expenses The first issue*292 for our determination is whether M-S.E. may deduct as a trade or business expense under section 162(a) 1 of the Internal Revenue Code of 1954, 2 the costs incurred in maintaining and operating Mid-South Stables, a horse farm owned by M-S.E. Petitioner, M-S.E., contends that under the circumstances herein, its business benefited by these activities and thus M-S.E. should be allowed to deduct these expenses in computing its taxable income. In short, the corporate petitioner's main contention 3 is that because M-S.E. was prohibited from advertising by the ethics of the engineering profession, horse raising and horse shows were used as its means of presenting the name of M-S.E. to people who might be instrumental in directing potential customers to M-S.E. or introducing Bowman to such persons. In this regard, M-S.E. contends that it afforded Bowman, the president and sole shareholder of M-S.E., an opportunity to meet the people who might be influential in directing business to M-S.E. *293 It is Bowman's and M-S.E.'s position that horse raising, horse breeding, horse training, and horse shows gave him an opportunity to publicize the firm's name and also to meet people who might be helpful in securing business for M-S.E. For this reason Bowman asserts that wherever he attended the horse shows, he arranged to have his seats located close to various local officials. In addition, due to these activities, his social contacts were also increased and he was invited to parties customarily given before and after the horse shows. As the Commissioner has disallowed the amount incurred as trade or business expenses, petitioner, M-S.E., has the burden of showing that a proximate relationship existed between the claimed expenses in operating Mid-South Stables, and the engineering business in which it was engaged. United Aniline Co. v. Commissioner, 316 F. 2d 701 (C.A. 1, 1963), affirming a Memorandum Opinion of this Court. Moreover, petitioner must show that these expenditures were reasonably calculated to promote the business of M-S.E. It is not sufficient to show that*294 some remote or incidental relationship may possibly have existed between the expenditures and the engineering corporation's business. Ralph E. Larrabee, 33 T.C. 838 (1960). Thus, the burden is on petitioner to show that the questioned expeditures were promoted for business reasons rather than other consideratiions. See Robert Lee Henry, 36 T.C. 879 (1961); Eugene H. Walet, Jr., 31 T.C. 461, affirmed per curiam 272 F. 2d 694 (C.A. 5, 1959); and Louis Greenspon, 23 T.C. 138, affirmed on this point 229 F. 2d 947 (C.A. 8, 1956). After careful consideration of the record in this case, we find that petitioners have failed to sustain the burden of proving that the expenses of operating Mid-South 116 Stables were incurred primarily to further the business of M-S.E. To the contrary, it appears that the expenditures were made primarily to sponsor an activity in which Bowman's daughter, Libby, was actively interested. The facts show that shortly after Libby began to learn to ride, Bowman acquired several horses, equipment, stables and a farm. Within this period, Bowman also hired Libby's riding teacher*295 to become the manager of the farm, Mid-South Stables. Therafter, as a result of Mrs. Sherrill's continued teaching and her own aptitude, Libby became an excellent horsewoman. She apparently enjoyed this activity and from this time on she rode in many horse shows. It was not uncommon for Libby and Mrs. Sherrill to practice assiduously, sometimes all day, and Libby won many awards as a horsewoman. Bowman, understandably proud of her accomplishments, publicized them in a monthly horse magazine. On occasion, Bowman's sons also rode in the shows. Other than the letterhead of Mid-South Stables stationery and an advertisement placed in monthly horse magazines, 4 there was no evidence presented to link Mid-South Stables with M-S.E. The equipment owned by the stables and which appeared at these horse shows only displayed the name of the Mid-South Stables and "Libby Bowman." The other articles written about Mid-South Stables featured Libby and her parents and made little, if any, reference to M-S.E. We recognize that petitioners' main contention is that the*296 horse shows provided a means for Bowman socially to meet people who might benefit the corporate business. However, where expenditures are made to further social contacts which may ripen into business relations, these expenditures must be closely scrutinized because they are susceptible to abuse. Robert Lee Henry, supra; Eugene H. Walet, Jr., supra; and Louis Greenspon, supra.It seems apparent that petitioner, M-S.E's, whole argument is grounded on the assumption that the "right" state and local officials (those who might have influence in employing M-S.E.) would attend the horse shows and related activities, and that this would further M-S.E.'s business. There is little evidence in the record to justify this assumption. The facts show that Mid-South Stables entered many shows throughout the Southeastern part of the United States, many times in states where M-S.E. was neither on the requisite eligibility list nor apparently ever intended to be. This, to some extent, evidences that M-S.E. was not making a bona fide attempt to obtain future business*297 when it entered many of the shows it did. There are also facts which indicate that this was not a business oriented venture. The following are the net expenses 5 incurred by M-S.E. for the operation of the stables for the fiscal years ending March 31, and charged off as trade or business expenses and depreciation on the books of M-S.E.: Fiscal Year EndingMarch 31Amount1959$ 10,275.551960100,810.52196149,820.41196250,217.461963 44,554.72Total $255,678.66 Viewed in the context that these expenses were made so as to provide a means for Bowman to meet the "right" people, we believe the amounts involved were out of line when compared to M-S.E.'s 6 income for these years. The record does not convince us that M-S.E., in fact, derived any substantial business benefit from the operation of Mid-South Stables. If any business benefits at all flowed from M-S.E.'s operation of the stables, they were only incidental to Bowman's main purpose, that of affording Libby an opportunity to display her talents, with the concomitant enhancement of family pride*298 in her, together with the social pleasures accompanying attendance at horse shows. 117 From the facts, we think that Bowman purchased horses primarily for his daughter when he recognized that Libby had the potential to become a champion horsewoman with the proper training. As a necessary adjunct, Bowman also purchased a farm, stables, and equipment. We believe Bowman was aware of the not insubstantial costs which would be involved in operating the stables and saw that if the corporation undertook the operation, the cost to him would be significantly reduced, at least taxwise. We do not question Bowman's sincerity in his testimony as to the "corporate motive," but on the whole record we are "skeptical of the weight to be accorded an interested witness' statement in view of other evidence [which] is not the same as wholly to reject the statement as if it were dishonest." R. L. Blaffer & Co., 37 B.T.A. 851, 856, affd. 103 F. 2d 487 (C.A. 5, 1939), certiorari denied 308 U.S. 576. We are not convinced that the operation of Mid-South Stables was proximately related to M-S. E.'s engineering business or that it was reasonably calculated to promote the business of M-S. E. To us, the facts disclose that the expenditures were prompted by personal considerations rather than by business reasons. Accordingly, we uphold the Commissioner's determination on this issue. In passing, we comment that the only witnesses were those called by petitioners. They were a witness who testified as to the fair market value of the properties purchased by M-S. E. for the stable operation; Katherine Sherrill who managed the stable for M-S. E. and taught Libby to ride, and Bowman, himself. Their testimony as to the relationship of the stable operation to the corporate engineering business is certainly inconclusive. Bowman met several state and local officials at the horse shows who might have had something to do with giving business to his corporation, but the connection is tenuous, indeed. None of these officials was called to testify. So far as the record shows, Bowman might as well have met them at church or the County Fair. No real relationship between the horse shows and the corporate business has been proven. It is also true that the record contains evidence that other corporations owned and used or showed horses - but how the expenses incurred were paid or treated for tax purposes by other business enterprises is left to the imagination. Nor was the motive for incurring the expenses shown. We do not see how this evidence can affect the result here. Constructive Dividends As the expenses incurred in the operation and maintenance of Mid-South Stables were not deductible by the corporate taxpayer as trade or business expenses under section 162, we turn to the question of whether these expenditures constituted constructive dividends to Bowman as the Commissioner determined. The burden of proof in this regard is on Bowman. Rule 32, Tax Court Rules of Practice.Other than the arguments presented relating to the deductibility of these amounts as trade or business expenses, petitioner, Bowman, has not made any other contention or presented any evidence to disprove the Commissioner's determination. In similar cases, we have held that where nondeductible expenses are incurred by a corporation for the personal enjoyment of a shareholder, they constitute constructive dividends to the shareholder who derives the benefit. Louis Greenspon, 23 T.C. 138, affirmed and reversed in part without discussion on this point 229 F. 2d 947 (C.A. 8, 1956); Eugene A. Mohr, 45 T.C. 600 (1966); Walker v. Commissioner, 362 F. 2d 140 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court. In light of Bowman's failure to present any evidence or make any other arguments on this issue, and having found the expenses in dispute to be nondeductible, as they were incurred for personal reasons on behalf of Bowman, we uphold the Commissioner's determination that the costs incurred by M-S. E. in the operation and maintenance of Mid-South Stables constitute dividends to Bowman. Negligence Penalty The Commissioner determined an addition to M-S.E.'s tax under section 6653 (a)7 for both taxable years in issue. *299 118 The burden of proving that the*300 imposition of this addition is erroneous rests upon petitioner. J.T.S. Brown's Son Co., 10 T.C. 840, 851 (1948). Thus, M-S. E. must prove that the underpayment was not due to negligence or intentional disregard of rules and regulations. David Courtney, 28 T.C. 658, 669 (1957). As M-S. E. has failed to adduce any evidence or make any arguments directed particularly toward this issue, there is nothing we can do but sustain the Commissioner's determination. Due to the concessions made by the parties, Decisions will be entered under Rule 50. Footnotes1. These amounts include the expenses from the operation of Mid-South Stables.↩1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * ↩2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified. ↩3. Petitioner has argued only in passing that Mid-South Stables was a separate trade or business. However, Bowman testified at trial that he never considered Mid-South Stables to be a different trade or business but only as a means of promoting M-S.E. In light of this and other facts discussed infra, we find that the operations of Mid-South Stables did not constitute a separate trade or business of M-S.E.↩4. This advertisement did not display the name M-S.E. in any prominent place and only mentioned M-S.E. in some minor regard.↩5. These amounts include the total expenses incurred less the income earned by the stables.↩6. ↩Net Amounts De-Fiscalducted OnTaxYearProfit and (Loss)Return AsEndingShown On TaxStable Ex-Mar. 31Returnpenses1959$71,978.36$ 10,275.551960(63,380.00)100,810.521961(49,820.41)49,820.411962(6,263.63)50,217.46196399,761.8844,554.727. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. The transcript in this case contains a few light notes, not affecting the result. For instance, "fiscal years" became "physical years" in the transcription, and, in talking of the use of horses in advertising, "Anheuser-Busch," became "Ben Houser Bush." Also, here's a caveat emptor from Mr. Bowman himself, who testified that, "we got a horse named Sassie Lassie that turned out to be a gelding, and I thought it was a mare from the name, and we called it Mr. Ed."↩