I. Hal Millsap, Jr., and Frances Millsap, Petitioners, v. Commissioner of Internal Revenue, Respondent

Docket No. 1556–64.   Filed September 27, 1966.

*William C. Myers, Jr.,* and *Max H. Myers,* for the petitioners.
*James H. Martin,* for the respondent.

Forrester, *Judge:* The respondent determined deficiencies in the income tax of the petitioners as follows:

| Year | Amount |
| --- | --- |
| 1957 | $2, 487. 47 |
| 1958 | 20, 187. 37 |
| 1959 | 3, 280. 14 |
| 1960 | 1, 569. 65 |

Respondent determined that petitioners are entitled to a net operating loss carryback deduction in 1958 from 1961 in the amount of $7,197.33. In determining the amount of such carryback deduction respondent disallowed deductions of $177.26 for interest and $379.95 for contributions which were claimed in petitioners' return for 1961. Petitioners alleged error in their petition on these issues, but they offered no evidence on them. We have therefore treated their contentions as abandoned. There remain for our decision the following questions:

(1) Was the amount of $83,857.87 [1] outstanding on loans made by petitioner I. Hal Millsap, Jr., to Millsap Oil and Gas Co. which became worthless in 1960 a business or nonbusiness bad debt?

(2) Did petitioners sustain a loss by reason of the destruction of their house and the contents thereof by fire in 1959 in excess of the amounts they were compensated for by fire insurance?

(3) Did petitioners realize income in 1959 upon the receipt of $2,500 of insurance proceeds for additional living expenses incurred as the result of the destruction of their home?

(4) Are the petitioners entitled to a nonbusiness bad debt deduction in 1959 in the amount of $1,000 for a loan made to George Billingsley?

(5) Are the petitioners entitled to a deduction of $1,000 in 1959 for a claimed promotional expense?

Separate findings of fact and opinions are hereafter set forth with respect to each of these issues. All facts that have been stipulated are so found. Those portions of the stipulation of facts which pertain to a particular issue are incorporated by this reference in the findings of fact for the issue to which they relate.

### Business Bad Debt Issue

#### FINDINGS OF FACT

The petitioners are husband and wife residing in Siloam Springs, Ark. Their joint Federal income tax returns for the years in question were filed with the district director of internal revenue, Little Rock, Ark. Petitioner Frances Millsap is a party herein only by reason of having filed joint returns with her husband, I. Hal Millsap, Jr., and he will hereafter be referred to as the petitioner.

From 1946 to the time of trial petitioner was associated with his father in a retail grocery business know as Hal Millsap Foodliner, which was operated as a partnership during the years in issue. During the period 1946 to 1953 this was petitioner's only business activity of consequence. In 1953, however, he began to take an interest in a variety of other ventures. Between 1953 and the time of trial he caused seven corporations to be formed. They were Razorback Oil & Gas Co., Kan-A-Tex-O-Oil & Gas, Inc., Millsap Oil & Gas Co. (hereafter MOG), Ram Oil Co., Mo-Ark Oil Co., Non-Censored News, Inc., and P.D.Q. Food Marts, Inc. The oil and gas companies were in the business of buying leases, drilling wells, and selling working interests. Non-Censored News published a quarterly journal on legislative developments and a local newspaper in Siloam Springs. P.D.Q. Food Marts operated a grocery store.

Petitioner owned stock in all these companies. Ram Oil and Mo-Ark Oil were both two-man corporations. Petitioner served in an

---

[1] Erroneously stated as $84,857.87 on statutory deficiency notice.

advisory capacity to the newspaper company. Whether he performed services for P.D.Q. Food Marts does not appear from the record. Petitioner, his father, and his wife controlled Razorback. Petitioner and his father owned all of the stock of Kan-A-Tex-O, except qualifying shares owned by petitioner's wife. MOG was formed in 1955 to consolidate under petitioner's control those interests in oil and mineral properties which were owned by him, Razorback, and Kan-A-Tex-O. Petitioner was president and a director of MOG and received the following amounts as salary:

| Year | Amount |
|------|--------|
| 1957 | 0 |
| 1958 | $4, 999. 92 |
| 1959 | 4, 583. 26 |
| 1960 | 0 |

At the time MOG was formed in 1955 the company issued over 1 million shares of stock in favor of petitioner or his nominees in consideration of the assignment by petitioner, Kan-A-Tex-O, and Razorback of oil and mineral properties owned by him and the two companies. By the end of 1958, petitioner owned 42,135 shares of MOG stock, about 1.75 percent. Kan-A-Tex-O owned 798,600 shares, about 33.3 percent. No other shareholder owned more than about 3.1 percent.

During 1958 petitioner sold an undisclosed number of his shares in MOG for a gross sales price of $89,320. Petitioner reported his gain thereon, $79,377.71, as long-term capital gain. In 1959 petitioner again sold an undisclosed amount of his MOG stock, this time for a gross sales price of $10,250. Petitioner reported his gain thereon, $8,831, as long-term capital gain.

Petitioner's income from the Foodliner partnership for the years in question was as follows:

| Year | Amount |
|------|--------|
| 1957 | $17, 776. 23 |
| 1958 | 17, 456. 04 |
| 1959 | 14, 070. 98 |
| 1960 | 15, 662. 44 |

His only other significant sources of reported income during those years were his MOG salary and gain from the sale of MOG stock. He reported no other income from salaries and no dividend income.

During the period from 1953 to the time of trial petitioner was also involved individually in real estate development in the Rio Grande Valley, the export-import business in Mexico, and the sale of fishing tackle.

Petitioner acquired a reputation as a potential investor in and advisor to new businesses. He traveled 75,000 to 100,000 miles annually to investigate about 100 proposed ventures, or "deals." He ultimately participated in a very small percentage of them.

Petitioner made loans to Ram Oil ($3,500 and $11,000), Mo-Ark Oil ($25,000), and P.D.Q. Food Marts ($5,000). He loaned Kan-A-Tex-O an undisclosed amount to cover legal fees incident to its incorporation. He loaned $10,000 to the A & P Mining Co., which was involved in gold and copper mining in South America. MOG owned one-quarter of the stock of A & P Mining Co.

Petitioner also made loans to employees of MOG and Kan-A-Tex-O. Sometimes they were made in order to promote projects of the companies and were in effect loans from petitioner to the companies. Sometimes they were personal loans not related to company business. Petitioner also made three loans to coventurers, each in the amount of $600.

Between March 8, 1955, and August 11, 1960, petitioner advanced to MOG sums totaling $249,155.76. During the same period MOG made repayments in the amount of $165,297.89. On August 11, 1960, the date of the last advance, MOG was indebted to petitioner in the amount of $83,857.87. No repayments were made after that date. MOG ceased to do business in 1960 and went into receivership. Petitioner deducted as a business bad debt the amount of $83,857.87 on his return for 1960.

Petitioner claimed net operating loss carryback deductions from 1960 in 1957 and 1958 based upon a net operating loss in 1960 that resulted from the claimed business bad debt deduction. These carryback deductions were tentatively allowed. Respondent subsequently determined, however, that petitioner was not entitled to the claimed business bad debt deduction in 1960. He thereupon assessed the deficiencies for 1957, 1958, and 1960 [2] that are here in issue.

OPINION

Respondent does not contest the characterization of the amounts advanced by petitioner to MOG as loans (rather than contributions to capital) ; nor does he contest that the debts due petitioner from MOG became worthless in 1960. The question that remains is whether these debts were business or nonbusiness, within the meaning of section 166(d)(2) of the 1954 Code. [3]

---

[2] The notice of deficiency states that petitioner claimed a deduction of $84,857.87 as a business bad debt in 1960. Petitioner had no capital gains for 1960. Therefore his deduction, under respondent's theory, should have been $1,000. See secs. 166(d)(1)(B) and 1211(b), I.R.C. 1954. Respondent therefore increased petitioner's taxable income by $83,857.87 in determining the alleged deficiency. It would seem that respondent should have increased petitioner's taxable income by $82,857.87. There was no dispute at trial or on brief that the amount claimed by petitioner as a business bad debt in 1960 was in fact $83,857.87.

[3] Sec. 166(d)(2) (as amended by sec. 8, Technical Amendments Act of 1958, Pub. L. 85-866, 72 Stat. 1606, 1608) provides the following :

(2) NONBUSINESS DEBT DEFINED—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer ; or

Petitioner asserts that his activities since 1953 show that he is in the business of "promoting, financing and developing corporations." He argues that his loans to MOG were proximately related to that business and that therefore the loss resulting from their worthlessness was properly deductible in full from ordinary income. See secs. 166(a)(1) and 166(d)(1) (A) and (B), 1954 Code.

*Whipple* v. *Commissioner*, 373 U.S. 193 (1963), involved loans by a substantial shareholder (about 80 percent) to one of several companies in which he owned stock and for which he performed services. The Supreme Court held that the debts were not incurred in a trade or business of the taxpayer where his services were for the purpose of producing income or gain in the form of dividends or enhancement in the value of his investment. The Court stated:

When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. * * *

The Court rejected the argument that "one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business." *Whipple* v. *Commissioner*, *supra* at 203. In that connection the Court disapproved, *inter alia*, of *Maytag* v. *United States*, 289 F. 2d 647 (Ct. Cl. 1961); *Henry E. Sage*, 15 T.C. 299 (1950); *Vincent C. Campbell*, 11 T.C. 510 (1948); and *Washburn* v. *Commissioner*, 51 F. 2d 949 (C.A. 8, 1931), "to the extent that they hold or contain statements to the contrary." *Whipple* v. *Commissioner*, *supra* at 203, fn. 10. Those cases involved fact patterns very similar to the instant case.

The Court recognized that "the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission * * * or for a profit on their sale * * *, *but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the cor-*

---

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

It should be noted that before 1954 the statute included clause (B) of the above definition, but clause (A) is new in the 1954 Code. It was added to overrule the position taken in the pre-1954 regulations that even though a claim arose in connection with the taxpayer's trade or business, it was a nonbusiness debt if he was no longer engaged in a trade or business when the claim became worthless. See sec. 29.23 (k)–6, Regs. 111; H. Rept. No. 1337, to accompany H.R. 8300, 83d Cong., 2d Sess., pp. 21–22 (1954); S. Rept. No. 1635, to accompany H.R. 8300, 83d Cong., 2d Sess., p. 24 (1954). We regard clause (A) as meaning that in order for a taxpayer to establish his right to a business bad debt deduction he must show not only that he was in a trade or business at the time the loan was made but also that the making of the loan was proximately related to the conduct of that trade or business. Cf. sec. 1.166–5(b)(2), Income Tax Regs.; and see *Weddle* v. *Commissioner*, 325 F. 2d 849 (C.A. 2, 1963).

*porate enterprise."* (Emphasis added.) *Whipple* v. *Commissioner*, *supra* at 202–203.

With respect to most, if not all, of the corporations which petitioner caused to be formed there seems little doubt that he would be classed as a promoter in the corporate or securities law sense of that term. That is, he was instrumental in organizing the corporations and solicited the investment therein by others.[4] However, as we read the *Whipple* decision, in order for such a promoter to be engaged in a trade or business for tax purposes he must undertake such activity for "compensation other than the normal investor's return." Such compensation must be "received directly for his own services rather than indirectly through the corporate enterprise."[5]

The record is devoid of evidence that petitioner received such compensation with respect to any of the corporations he caused to be formed. Petitioner's testimony concerning the formation of MOG was as follows:

Q. What was the next business venture?

A. A few people that were in Razorback and I all were interested in the oil business. It looked as though it was quite profitable. We decided to expand on a larger scale. I got hold of some brokers in Wilmington, Delaware, and we formed Millsap Oil and Gas Company.

To be sure, petitioner received stock in MOG, but there is no suggestion in the record that such stock was received for promotional services. Cf. Ballantine, Corporations sec. 35 (rev. ed. 1946), cited by the Court in *Whipple*. In fact, it appears that petitioner received his stock in MOG in return for oil and gas leases owned by him and for his interest in Razorback Oil & Gas, Inc., which was the predecessor of MOG. On that state of the record we are unable to find that peti-

---

[4] The Securities and Exchange Commission, in rule 405 under the Securities Act of 1933, 15 U.S.C. secs. 77a *et seq.*, 17 C.F.R. 230.405 (q), has defined promoter as follows:

*Promoter.* The term "promoter" includes:

(1) Any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer;

(2) Any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.

Regulation A, a small issue exemption promulgated under the same Act, contains an identical definition. See 17 C.F.R. 230.251.

See also 1 Fletcher Cyclopedia of the Law of Corporations, sec. 189 (1963).

[5] For readings of *Whipple* in accord with ours, see *Ralph Biernbaum,* T.C. Memo. 1963–210; Herwitz, Cases and Materials on Business Planning, Part 1, pp. 90–91 (temp. ed. 1963); Dillingham, "Ordinary vs. Capital Losses on Business Investments," 48 Marq. L. Rev. 70 (1964); and Note, "Taxation—Bad Debts: Limitations of the 'Promoter Doctrine,'" 13 Buffalo L. Rev. 644–645 (1964). Cf. Note, "Shareholder—Creditor Bad Debts Under Section 166, of the Internal Revenue Code," 75 Harv. L. Rev. 598 (1962), which was written before the Supreme Court's decision in *Whipple.*

tioner's loans to MOG were proximately connected with a trade or business of the taxpayer of promoting corporations for a fee or commission.

The record is also insufficient, in our view, to support a finding that petitioner organized the companies he did for the purpose of "developing the corporations as going businesses for sale to customers in the ordinary course." *Whipple* v. *Commissioner*, *supra* at 203. There is no evidence to suggest that petitioner organized the corporations he did with a view to quick and profitable sale after each business had become established, rather than to long-range investment gains. Cf. *Giblin* v. *Commissioner*, 227 F. 2d 692, 696 (C.A. 5, 1955) ; *Bodzy* v. *Commissioner*, 321 F. 2d 331 (C.A. 5, 1963) ; *United States* v. *Byck*, 325 F. 2d 551 (C.A. 5, 1963). In addition, we cannot ignore the fact that petitioner reported his gain from sales of MOG stock in 1958 and 1959 as long-term capital gain. That treatment is not wholly inconsistent with petitioner's argument that he was a dealer in enterprises, but it strongly suggests that petitioner viewed himself as an investor in MOG and not as one in the trade or business of developing MOG for sale to customers. Cf. *H. Beale Rollins*, 32 T.C. 604, 616, affd. 276 F. 2d 368 (C.A. 4, 1960), and *Thomas Reed Vreeland*, 31 T.C. 78, 83 (1958). Petitioner has not borne his burden of proving that he sought anything other than an investor's return from the enterprises he organized and advised. Cf. *United States* v. *Clark*, 358 F. 2d 892 (C.A. 1, 1966) ; *Eugene A. Mohr*, 45 T.C. 600 (1966).

Nor will the record here support a finding that petitioner was in the business of lending money. Petitioner made loans to companies in which he or MOG had an interest, to employees of Kan-A-Tex-O and MOG and to individual coventurers. There is no evidence to suggest that the loans to companies were made for any reason other than to protect or enhance petitioner's or MOG's investments therein. The loans to employees were either of a personal nature or to foster projects in which the companies had an interest. Loans of the latter variety to employees were, in effect, loans from petitioner to the companies. They were made to further the companies' business and thereby petitioner's investments. Petitioner made three loans to coventurers, each in the amount of $600. It does not appear that he made serious efforts to collect them when the ventures failed. In two cases petitioner treated the debts as "nonbusiness losses (loans)" on his income tax returns. Petitioner reported no interest income on loans during the years in question. The activities summarized above are not enough, in our view, to merit a finding that petitioner was in the trade or business of lending money. *Whipple* v. *Commissioner*, *supra; Holtz* v. *Commissioner*, 256 F. 2d 865 (C.A. 9, 1958).

Nor will this record support a finding that petitioner was in any other separate trade or business in an individual capacity (distinct

from that of MOG or of the other corporations he caused to be formed) to which the loans in question could have been proximately related. Cf. *Maloney* v. *Spencer*, 172 F. 2d 638 (C.A. 9, 1949), *J. T. Dorminey*, 26 T.C. 940 (1956), cited with approval by the Court in *Whipple*.

It has been held that rendering services to a corporation for a salary may constitute a trade or business. *Trent* v. *Commissioner*, 291 F. 2d 669 (C.A. 2, 1961). To the extent that petitioner received a salary from MOG he was in that trade or business. However, the loans in question were not, in our view, proximately related to that trade or business. Petitioner described the services he rendered to MOG as follows:

What I did was general supervision. I was the president, I was on the board of directors, I was paid a small salary. There were many in the company that drew more money out in salary than I did, but I did get expenses, salary. I was available for discussion if problems arose or if they needed any promotional advice.

The record contains no evidence to suggest that petitioner was significantly motivated in making the advances he did in order to protect his position as a salaried officer of MOG. Cf. *Weddle* v. *Commissioner*, 325 F. 2d 849 (C.A. 2, 1963). The loans were not necessary to keep the company in business. Petitioner testified that what "broke" the company and "shut us down completely" was a series of difficulties with the Securities and Exchange Commission concerning an offering of MOG stock in 1959. It is clear that the loans were not required of petitioner as a condition of his retaining his position with MOG since he had working control of the company. Cf. *Trent* v. *Commissioner*, *supra*, and *Eugene H. Rietzke*, 40 T.C. 443 (1963).

The debts here in issue were not created in connection with a trade or business of the taxpayer. Nor was the loss from the worthlessness of these debts incurred in the taxpayer's trade or business. It follows that the respondent's determination with respect to this issue must be upheld.

### Casualty Loss Issue

#### FINDINGS OF FACT AND OPINION

Petitioner's home, built in 1951, was destroyed by fire in 1959. He received $25,000 in insurance proceeds for damage to the house and $12,500 for damage to its contents. These amounts represented the full amount of petitioner's fire insurance coverage on the house and its contents. On his return for 1959 petitioner claimed a casualty loss of $22,500, which was disallowed by respondent.

There is no question that petitioner's residence and its contents were in fact destroyed by fire in 1959. The only issue is the amount of the

deduction, if any, to which petitioner is entitled. Section 165(a) of the 1954 Code permits a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." In the case of an individual sustaining a loss to nonbusiness property the deduction is limited to losses sustained from various casualties, including fire. Sec. 165(c), I.R.C. 1954. Section 165(b) provides that "the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." Interpreting this latter provision, it has been held that the measure of a casualty loss to nonbusiness property is the difference between the fair market value of the property immediately before the casualty and its value immediately thereafter, not to exceed, however, the adjusted basis of the property. *Helvering* v. *Owens*, 305 U.S. 468 (1939); G.C.M. 21013, 1939–1 C.B. (Part 1) 101; sec. 1.165–7(b)(1), Income Tax Regs. Thus, for the taxpayer to establish his claim to a casualty loss deduction he must prove, among other things, the fair market value of the property immediately before the casualty, its fair market value immediately thereafter, and the property's basis.

Petitioner's records showing the cost of his house were destroyed in the fire as were most of his records relating to the cost of furnishings and other items in the house that were destroyed by the fire. Petitioner testified that his house was a two-story building, some 2,860 square feet in area, plus garage, with Roman brick facing on the front up to the second floor. A two-story chimney, 8 feet wide, was entirely faced with Roman brick. The remainder of the house, including the roof, was of asphalt siding shingles. The house had a living room, dining room, den, kitchen, 2½ baths, and four bedrooms. It did not have a basement. It had gas heat, a fireplace, was centrally air-conditioned, fully insulated, and screened.

Petitioner testified that the "cash value" of the house before the fire was between $45,000 and $50,000, and that he had $40,000 or $50,000 cash "in the house" at that time. It is not entirely clear whether petitioner was testifying as to basis or fair market value. Petitioner offered no evidence other than his own testimony with respect to his basis in the house or its fair market value. He stated at one point that he had "no idea of knowing" how much the house had cost to build.

Neither the house nor its furnishings had any value after the fire

Petitioner paid for the labor and materials for the construction of the house by checks, some of which were drawn on the Bratt-Wasson Bank in Siloam Springs. This bank kept a microfilm record of such checks, but they were not produced at the trial. In 1957 petitioner's residence was given an assessed valuation of $11,970. There was no

evidence of the relationship in practice between the fair market value and the assessed valuation of property in the locality.

Respondent's position is that petitioner has failed to carry his burden of proving either the fair market value of the house before the fire or his basis therein.

Petitioner impressed us as being entirely truthful. We do not attach great weight to the evidence with respect to assessed valuation. We feel that it is a fair inference from the context in which petitioner's answers were given that when he spoke of "cash value" he was speaking of fair market value. However, without reaching the question whether petitioner's own testimony would be enough to establish fair market value or whether it would be enough to permit us to apply the rule of *Cohan* v. *Commissioner*, 39 F. 2d 540, 543 (C.A. 2, 1930), in determining value before the casualty, we have concluded that petitioner has failed to prove another element of his case, which failure of proof is fatal to his claim.

Petitioner has introduced no evidence, other than his own vague statements, with respect to his basis in the house even though a permanent record of at least a part of his construction expenses was available. As indicated earlier this figure marks the upper limit of any possible casualty loss deduction to which he might be entitled. Where the taxpayer does not prove basis this Court has consistently held that his loss cannot be computed. *Samuel Towers*, 24 T.C. 199, 239 (1955), affirmed as to other issues sub nom. *Bonney* v. *Commissioner*, 247 F. 2d 237 (C.A. 2, 1957); *Eric H. Heckett*, 8 T.C. 841, 847 (1947); and cf. *Burnet* v. *Houston*, 283 U.S. 223 (1931). There have been cases where a failure of proof on the issue of basis has been overlooked to permit the allowance of a small casualty loss deduction where it could reasonably be inferred from other facts of record that the allowed amount did not exceed basis, but this is not such a case. We do not feel that application of the *Cohan* rule is appropriate here on the question of basis.[6]

There was testimony in the record to suggest that petitioner built a new house after the fire on the same foundation; that it was practically the same as the house which was destroyed, and that this new house was sold in 1963 for $22,500. On that state of the record we do not feel that it would serve the end of reaching approximate justice to assign to the destroyed house a basis in excess of the $25,000 which petitioner received in insurance proceeds.

[6] Cf. Caplin, "Casualty Losses: Recent Developments," 12th Ann. N.Y.U. Tax Inst. 542 (1954).

"The taxpayer has the burden of proving the adjusted basis of the property, as well as its fair market value immediately before and after the casualty. His cost or adjusted basis is perhaps the most important element to be established, for the courts have strictly required clear proof on this issue.[95] Except in regard to computing the extent of capital improvements or other adjustments to the taxpayer's basis,[96] the *Cohan* rule[97] is rarely applied here." (Footnotes omitted.)

We emphasize that we were impressed by petitioner's honesty. We do feel, however, that he has failed to prove one of the necessary elements of his case, i.e., his basis in the destroyed house. Therefore we are unable to find that he suffered a loss greater than the $25,-000 for which he was compensated by insurance.

Petitioner testified from memory as to various items of personal property which were in the house at the time of the fire. His testimony ranged over such items as: Drapes, carpeting, stove, dishwasher, refrigerator, dryer, mixer, blender, electric can opener, china, silverware, crystal, desk, chair, antique swinging lamp, dining room table and chairs, Hammond organ, piano, oil painting, marble tables, Mexican pitcher and bowl, antique china plates and cups, couch, rocker, two television sets, golf clubs, fishing equipment, guns, books, clothing (including 50 suits, 3 tuxedos, 100 pairs of shoes, a fur coat, and fur stole), bedroom furnishings, and an antique pitcher collection. Petitioner made no attempt to estimate the fair market value of any of the contents of the house except for his guns, his wife's furs, and the furnishings in the four bedrooms. Even with respect to these items it is not clear from the record that petitioner was testifying as to fair market value since all of petitioner's other references to amounts were to the estimated cost of various items. Many of the items of personal property in the house at the time of the fire were of a type that would depreciate in value over a period of time. The furniture other than true antiques, the guns, television sets, appliances, clothing, and sporting equipment were all of this nature. There is no testimony at all as to the age of the items involved except for some of the appliances, the piano and organ, and petitioner's tuxedos. As to some of the items of personal property in the house at the time of the fire, the record is silent as to the amount of either cost or fair market value.

Petitioner introduced collateral evidence, in the form of canceled checks not destroyed by the fire, showing purchases of about $9,000 for clothing, furniture, and household appliances during the period November 1957 to October 1959. Petitioner also produced checks showing that during the year after the fire he spent some $11,500 replacing clothing, furniture, and household appliances destroyed by the fire.

In our view petitioner's evidence with respect to the furnishings and other items in the house that were destroyed by fire is too vague and uncertain to establish either their fair market value before the fire or his basis in them. Because of these failures of proof we are unable to find that his loss on these items was any greater than the $12,500 for which he was compensated by insurance.

### Additional Living Expenses Issue

#### FINDINGS OF FACT

Petitioner received in 1959, in addition to insurance proceeds to compensate for the damage to his house and the contents thereof, $2,500 to compensate for additional living expenses, over and above normal living expenses, occasioned by the fire. Petitioner did not include this amount as income on his return for the year 1959.

#### OPINION

Section 61 of the 1954 Code defines gross income to include "all income from whatever source derived." Insurance proceeds for additional living expenses are not excluded from gross income by any of the provisions of sections 101 to 122, inclusive, of the 1954 Code. Accordingly, the $2,500 received by petitioner is includable in his income for the year 1959. Rev. Rul. 59–360, 1959–2 C.B. 75.

To the extent that petitioner may have incurred additional living expenses as a result of the casualty to his home, such expenses are not deductible as part of the casualty loss under section 165 since that section permits a deduction only for losses in property value. *Samuel E. Mulholland*, 16 B.T.A. 1331 (1929) ; Rev. Rul. 59–360, *supra*.

Since all the additional expenses in issue are living expenses they are nondeductible under section 262 of the 1954 Code. Rev. Rul. 59–398, 1959–2 C.B. 76.

Respondent therefore properly increased petitioner's income for 1959 in the amount of $2,500.

### Billingsley Loan Issue

#### FINDINGS OF FACT AND OPINION

On a schedule attached to his return for 1959 petitioner listed a number of "Non business losses (loans)." Among them was the following : "George Billingsley, $1,000."

This amount was treated as a short-term capital loss and offset against petitioner's long-term capital gain from the sale of MOG stock in that year. See secs. 166(d) (1) (B) and 1211(b), 1954 Code. Respondent determined that the deduction was not allowable.

To establish his right to the deduction claimed petitioner must prove that a loan was in fact made, that the debt had value when created, *Eckert* v. *Burnet*, 283 U.S. 140 (1931), section 1.166–1(c), Income Tax Regs., and that some identifiable event or circumstance during 1959 established that the debt became worthless during, and prior to the end of that year. *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, 279 F. 2d 368 (C.A. 10, 1960).

Petitioner testified that he loaned $1,000 to George Billingsley in 1959 at the request of the Little Rock, Ark., general manager of MOG. Billingsley was not further identified, but petitioner testified that the money was handed to Billingsley on the occasion of the latter's departure for Kentucky to secure oil and gas leases for MOG.

Petitioner impressed us as being entirely truthful. We believe his testimony that a loan was in fact made and the circumstances prove that the debt had value when created. No argument has been made that the parties intended a gift. The lack of documentary evidence to substantiate the loan is reasonably explained by the destruction of petitioner's personal records in the fire that destroyed his home. Petitioner made the loan by writing a personal check to cash, which was immediately cashed and the proceeds turned over to Billingsley.

Petitioner never saw Billingsley again after the loan was made. We therefore find that a loan was made; that the debt had value when created, and that the debt became worthless in 1959. It follows that petitioner is entitled to the claimed deduction. Cf. *Edward F. Dalton,* 2 B.T.A. 615 (1925) ; *Paterson* v. *United States,* 122 F. Supp. 770, 771 (S.D. Ala. 1954).

## Promotional Expense Issue

### FINDINGS OF FACT AND OPINION

On his return for 1959 petitioner deducted from ordinary income the amount of $1,000 as a "promotional expense." Respondent determined that the amount claimed did not represent an allowable deduction and the petition assigned error to such action.

In order to establish his claim to this deduction under either section 162 or section 212 of the 1954 Code petitioner must prove that an expense was incurred.

To support the claimed deduction petitioner testified to the effect that he loaned $1,000 to Ed Connell, MOG's "best salesman," during 1959. Petitioner stated explicitly that he gave the money to Connell as a loan and that he expected to be repaid when Connell earned certain commissions. Petitioner was in fact never repaid.

Such testimony of a simple loan cannot support a claimed business expense deduction. Sec. 1.162–1(a), Income Tax Regs. Cf. *Putnam* v. *Commissioner,* 352 U.S. 82 (1956), and there has been no motion to conform the pleadings to the proof. See Rule 17 (d), Tax Court Rules of Practice.

Even if we were to waive this omission it is clear that petitioner has not established his entitlement to a nonbusiness bad debt deduction for 1959 as the result of the loan to Connell. The loan was made by check, but the check was not produced. Again, however, the destruction of petitioner's records by fire provides a reasonable ex-

764

planation for the lack of documentary evidence. We believe the debt had value when created.

There is, however, insufficient evidence, in our view, to establish that the debt became worthless in 1959. Petitioner did not testify, as he did in connection with the Billingsley transaction, that he had not seen Connell since the loan was made. There is absolutely nothing in the record with respect to worthlessness beside petitioner's statement that he had never been repaid. On that state of the record we believe petitioner has failed to prove a necessary element of his case. Cf. *Avery* v. *Commissioner*, 22 F. 2d 6 (C.A. 5, 1927), affirming 5 B.T.A. 872 (1926).

*Decision will be entered under Rule 50.*