DAVID H. BETTS AND JOAN O. BETTS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 698–72.   Filed July 29, 1974.

*Robert M. Gunn*, for the petitioners.
*Harmon B. Dow*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $2,172.30 in the Federal income tax of the petitioners for the year 1966. There are two issues for decision: (1) Whether a loan by Electronics, a limited partnership, was created or acquired in connection with its trade or business, and (2) whether the failure to perform on a guaranty of such loan gives rise to a loss deductible under section 165 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, David H. Betts and Joan O. Betts, are husband and wife. At the time their petition was filed in this case, they maintained their legal residence in Lake Forest, Ill. They reported income

---

[1] All statutory references are to the Internal Revenue Code of 1954.

in accordance with the cash receipts and disbursements method of accounting and filed a joint return for the year 1966 with the Internal Revenue Service Center, Kansas City, Mo. Mrs. Betts will sometimes be referred to as the petitioner.

The First Electronics Fund-2 (Electronics) was formed as a limited partnership on September 22, 1961. Mrs. Betts was a limited partner from the time of its formation and throughout the year in issue.

The limited partnership agreement of Electronics provided that the purpose of the partnership was to participate in the development of companies in the electronics industry and related fields by means of "lending money to and investing in such companies" and "furnishing consulting and advisory services to such companies in all fields of management, sales and manufacturing." The affairs of the partnership were conducted by its general partner, who investigated each of the proposals received by the partnership and decided where and how its funds should be placed. In some instances, the partnership merely purchased stock in a firm. In two instances, the partnership provided short-term financial assistance by means of a loan. When a loan was made, the partnership sought to secure a repayment of the loan within a short time so that the funds could then be invested in other enterprises. In addition to receiving interest for the loan, the partnership also obtained stock and, in one instance, warrants of the borrower. The partnership contemplated that the stock and warrants would be distributed to the partners so that they could participate in any appreciation in value of the equity in the business. The general partner served as a director of the enterprises to which loans were made, and the partnership also assisted the borrowers by furnishing them with services as a consultant for which the partnership was compensated.

From 1961 through 1966, Electronics acquired two interest-bearing securities, exclusive of Treasury bills. In December 1961, it acquired a $425,000 subordinate convertible debenture, along with $50,000 common stock, of the Commercial Trust Co., later called Commercial Mortgage & Finance Corp. (Commercial). In 1964, that debenture was converted into common stock of Commercial, as part of a plan to restructure and refinance its operations.

Pursuant to an agreement with the Gibraltar Co. (Gibraltar), dated May 17, 1962, Electronics acquired at face value a $200,000 6¾-percent subordinated note due May 1, 1967, on which Gibraltar was the obligor. Electronics acknowledged that it was holding the Gibraltar note as an investment and that it did not intend to resell it in a fashion which would violate the Federal securities laws.

As part of the same agreement, Electronics also acquired 61,691 shares of Gibraltar common stock for $104,192 and received a stock purchase warrant to acquire 40,000 shares of Gibraltar common at

$1.20 per share, exercisable for a period of 5 years. The warrants were exercised by Electronics in 1963. The 61,691 shares of Gibraltar acquired by Electronics represented approximately 48 percent of the 129,382 outstanding shares of Gibraltar, as of May 17, 1962. The 40,000 warrants to purchase stock in Gibraltar represented approximately 54 percent of the 74,116 Gibraltar warrants, as of May 17, 1962.

The closing balance sheets of Electronics, as of December 31, for each of the years 1961 through 1966, showed that its assets included the following items:

| Year | Notes receivable | Treasury notes | Common stockholdings | Total assets |
|---|---|---|---|---|
| 1961 | $425,000 | $198,753 | 0 | $812,642 |
| 1962 | 625,000 | 50,000 | $200,000 | 1,011,304 |
| 1963 | 625,000 | 31,723 | 491,375 | 1,174,624 |
| 1964 | 200,000 | 31,698 | 898,384 | 1,180,981 |
| 1965 | 200,000 | 31,658 | 766,566 | 1,032,737 |
| 1966 | 0 | 0 | 69,600 | 82,102 |

Electronics reported the following amounts of interest, consulting fees, and gross income for each of the years 1961 through 1966:

| Year | Interest | Consulting fees | Gross income |
|---|---|---|---|
| 1961 | $157.19 | 0 | $157.19 |
| 1962 | 40,413.18 | $2,037.34 | 42,450.52 |
| 1963 | 43,258.08 | 13,820.94 | 57,079.02 |
| 1964 | 42,762.80 | 13,553.93 | 56,316.73 |
| 1965 | 14,760.08 | 0 | 14,760.08 |
| 1966 | 5,783.09 | 0 | 5,796.87 |
| Total | 147,134.42 | 29,412.21 | 176,560.41 |

Although originally successful, Gibraltar later encountered financial difficulty resulting from the dishonesty of a key employee. In April 1965, Electronics entered into an agreement with Acme, Inc. (Acme), under which Acme purchased the stock of Gibraltar held by Electronics for $33,336.35. That sum amounted to 35 cents per share for 100,691 shares. In addition, Acme guaranteed payment of the principal and interest outstanding on the note held by Electronics, and in any event, agreed to purchase that note not later than 12 months from the date of the agreement. At the time of the agreement, Gibraltar was insolvent. However, Acme was financially solvent, and its offer was the only alternative at that time to the liquidation of Gibraltar.

On its United States partnership return of income for the year 1965, Electronics reported a gross sales price of $35,241.85 for the shares of Gibraltar stock.

In 1966, Gibraltar went into receivership and defaulted on the note. Acme, too, went into receivership that year and defaulted on its guaranty. No amount was ever recovered on the note.

In his notice of deficiency, the respondent determined that the loss incurred by Electronics on the note given by Gibraltar was attributable to a nonbusiness bad debt and that Mrs. Betts' distributive share of that loss was subject to the limitations of section 1211.

Two alternative issues have been presented for decision: (1) Whether Electronics suffered a loss from the worthlessness of a business debt, which is deductible under section 166(a), when Gibraltar failed to make payment on its note and went into receivership in 1966; or if not, (2) whether Electronics suffered a loss from a transaction entered into for profit, which is deductible under section 165(a), when, in accordance with its contract of guaranty, Acme failed to make payment on the note after Gibraltar defaulted.

Section 166(a) allows a deduction for any debt which becomes worthless within the taxable year. However, in the case of a taxpayer other than a corporation, section 166(d)(1) provides that the general rule of section 166(a) does not apply to nonbusiness debts, and that when such debts become worthless, the resulting loss is considered to be a loss from the sale or exchange of a capital asset held for not more than 6 months. Section 166(d)(2) defines the term "nonbusiness debt" as:

a debt other than—
   (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
   (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Whether a debt is to be classified as a business or nonbusiness debt is a question of fact, and the petitioner has the burden of establishing that Electronics was in a trade or business and that the debt of Gibraltar was so connected with that trade or business as to constitute a business debt. Sec. 1.166–5(b), Income Tax Regs.; *I. Hal Millsap, Jr.*, 46 T.C. 751, 754 fn. 3 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968); *Stuart M. Sales*, 37 T.C. 576, 580 (1961). In *Whipple* v. *Commissioner*, 373 U.S. 193, 202 (1963), rehearing denied 374 U.S. 858 (1963), the Supreme Court was faced with this question and observed:

Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is

not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

The Court recognized that a taxpayer might be "engaged in a regular course of promoting corporations for a fee or commission," or "for a profit on their sale," but in connection with such situations, the Court pointed out that "in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise." 373 U.S. at 202–203.

The petitioner urges us to view the activities of Electronics as divisible into two categories: She argues that the acquisition of stock constituted an investment, but she contends that the activities of making loans and furnishing consulting services were intertwined and together constituted the business of financing. Though this suggested division of the activities of Electronics neatly suits her purposes, we believe that it is not warranted by the facts.

The authorized purpose of Electronics was to participate in the development of certain companies by means of lending money to such companies and investing in them. In the two instances during the period 1961 through 1966 when Electronics loaned money in return for notes, the acquisition of an equity interest was an important aspect of the transactions. In 1961, Electronics acquired a convertible debenture along with $50,000 of common stock in Commercial; the debenture was converted into shares of common stock in 1964. In 1962, Electronics acquired the $200,000 note in issue and, in the same transaction, acquired 48 percent of the issued and outstanding shares of stock in Gibraltar and 54 percent of the outstanding warrants of that corporation. The warrants were exercised in 1963. In both instances, the objective was, not only to have the principal repaid so that it could be invested elsewhere, but also to have the limited partners receive the warrants and common stock so that they could benefit from the anticipated corporate growth through the appreciation in value and eventual sale of equity holdings. Thus, making the loans was merely a step in the accomplishment of the investment objectives of Electronics.

The loans made by Electronics did not in and of themselves constitute the carrying on of a trade or business. During the years 1961 through 1966, the record reveals that the only loans made by Electronics were those made to Commercial and Gibraltar. The making of

just two loans in a period of 6 years is not sufficient activity to warrant a finding that such activity was the carrying on of a trade or business. *Gustin* v. *Commissioner*, 412 F. 2d 803 (C.A. 6, 1969), affirming per curiam a Memorandum Opinion of this Court; *Robert E. Imel*, 61 T.C. 318, 323 (1973).

The petitioner appears to recognize that Electronics was not in a separate business of making loans; she asserts that when Electronics made loans, it also provided consulting services and that therefore the two activities should be considered together. The petitioner in part relies upon the fact that the general partner of Electronics served on the boards of directors of the borrowers, but such service by him does not constitute the carrying on of a trade or business. The partnership also held stock in the borrowers, and the partner's activities as a director may have served merely to protect their stockholdings and to insure that the borrowers would be able to repay their loans. There has been no showing that there was separate compensation for such activities. *Whipple* v. *Commissioner*, 373 U.S. 193, 202 (1963); *I. Hal Millsap, Jr.*, 46 T.C. 751 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968). Although the partnership did render some services for which it received compensation, there is no reason to connect those services with the loans, as distinguished from the investments. Moreover, even if those services did constitute a business activity, the loans were not made as a part of that activity—they were made as a part of the investment objectives of the partnership. *Syer* v. *United States*, 380 F. 2d 1009 (C.A. 4, 1967); *United States* v. *Clark*, 358 F. 2d 892 (C.A. 1, 1966), certiorari denied 385 U.S. 817 (1966); *United States* v. *Byck*, 325 F. 2d 551 (C.A. 5, 1963). Hence, we find that the loan to Gibraltar was not created in connection with any business of Electronics.

The petitioner claims that section 1.954-2(d)(2)(ii) of the Income Tax Regulations deals with an analogous question and that it should be applied in this case. Under that provision of the regulations, a corporation is considered to be in the financing business if interest constitutes more than 50 percent of its gross income. However, that provision is by its terms to be applied only for purposes of section 954. Moreover, that rule was developed for purposes of applying the provisions to foreign corporations, and there is no reason to believe that a similar rule should be applied for purposes of section 166. Whether a debt is to be treated as a business or nonbusiness debt under section 166 has been the subject of extensive litigation, and the decisions have established the tests to be applied for such purposes. There are no grounds for believing that those tests should now be set aside in favor of the rule set forth in the regulations under section 954.

With respect to the petitioner's alternative argument, section 165(a)

allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. However, section 165(b) limits the deduction to the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. In the case of individuals, the deduction is further limited by section 165(c), in pertinent part, to losses incurred in a trade or business or to losses incurred in any transaction entered into for profit, though not connected with a trade or business.

The petitioner claims that the sale of the Gibraltar stock by Electronics and the receipt of the guaranty by Acme constituted a single transaction entered into for profit. She contends that when Acme defaulted and went into receivership, there no longer was a real possibility of reimbursement and that the loss was thereby evidenced by a closed transaction. Finally, the petitioner argues that Electronics had an adjusted basis in the contract of guaranty equal to the value of such contract upon its receipt and that the value of the contract was $200,000 since it furnished a means whereby Electronics might recover on the Gibraltar note, which otherwise was uncollectible. We are not persuaded by such argument.

The provisions of section 165 and section 166 represent a policy decision by Congress to treat losses from debts differently from other losses, and accordingly, such sections are mutually exclusive. *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934); *M. Seth Horne*, 59 T.C. 319, 336 (1972); *D. P. Harris Hardware & Manufacturing Co.*, 24 B.T.A. 752 (1931), affirmed per curiam 71 F. 2d 1004 (C.A. 2, 1934). Merely adding a guaranty to strengthen the note of the debtor is not enough to remove a claimed deduction from the coverage of section 166 when a debt becomes worthless. In such circumstance, it is clear that regardless of the guaranty, the creditor has suffered only one loss, and such loss is attributable to the worthlessness of the debt.

The petitioner argues that the contractual obligation of Acme grew out of a transaction quite separate and apart from the debtor-creditor relationship of Gibraltar and Electronics. She contends that allowance of a deduction for the loss attributable to that transaction should be judged on its own merits under section 165. However, the record does not support the allowance of a deduction under section 165. Even if all the requirements for the allowance of a deduction were otherwise met, the deduction is limited to the adjusted basis of the asset which was lost. Section 1011 provides that the adjusted basis is the basis determined under section 1012, or other applicable sections not relevant to the proceedings herein, adjusted as provided in section 1016. Section 1012 provides that the basis of property shall be the cost of such property, except as otherwise provided. The petitioner has ut-

terly failed to show that anything was paid for the guaranty by Acme.

Clearly, the fact that Electronics may have hoped that it could recover on the Gibraltar note as a result of the guaranty does not establish that the promise had a basis equal to the amount of the note. Furthermore, in 1965, when Electronics sold the Gibraltar stock to Acme, it received consideration of $33,336.35, and on its partnership return, it reported substantially the same amount as the consideration received for the sale of the stock. It did not treat the guaranty as a part of the consideration for the sale of the stock, and no evidence has been offered to show that the treatment of the sale of the stock was incorrect and that in fact more consideration was received for the stock. Thus, the petitioner has failed to show that Electronics had any basis in the promise of guaranty by Acme, and in the absence of any such basis, there has been no loss sustained which is deductible under section 165.

*Decision will be entered for the respondent.*