RAY EBERHART and PEGGY EBERHART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Eberhart v. Commissioner
Docket No. 4733-75.
United States Tax Court
T.C. Memo 1977-155; 1977 Tax Ct. Memo LEXIS 289; 36 T.C.M. (CCH) 660; T.C.M. (RIA) 770155; May 23, 1977, Filed *289 Petitioner had made 60 loans to various individuals and corporations over a 26-year period. Certain loans made in 1968 and 1970 became worthless in 1971. Held, petitioner was not in the business of lending money during 1968 to 1971, and losses sustained in 1971 are deductible only as nonbusiness bad debts. Held further, attorneys' fees paid by petitioners in 1971 are not allowable as a deduction either under section 162 or section 212, I.R.C. 1954. Elmer E. Lyon, for the petitioners. Thomas L. Kummer, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: Respondent determined deficiencies in the Federal income tax of petitioners for 1968 and 1971 in the respective amounts of $17,210.91 and $3,528.00. The issues presented for decision are whether certain losses suffered by petitioners in 1971 resulted from business or nonbusiness bad debts and whether a payment for attorneys' fees was a deductible expense in 1971. FINDINGS OF FACT The stipulated facts are so found and incorporated herein. The petitioners are husband and wife whose legal residence was Mishawaka, Indiana, at the time their petition was filed in this case. Petitioners filed joint individual *290 returns with the internal revenue service center at Cincinnati, Ohio, for both years here involved. For convenience we shall hereinafter refer to Ray Eberhart as petitioner. After graduating from Georgia Tech University in 1933 with a degree in mechanical engineering, petitioner "floated" for a number of years to further his education in engineering and tool and die design and construction. In 1943 petitioner began his own tool and die business. After that time and prior to 1970, petitioner created or acquired ownership interests in a number of businesses, including Mishawaka Tool and Die Corporation, Servi Corporation, Eberlane Mobile Homes, Eberhart Realty Company and Eberhart Steel Products, Inc. With the possible exception of Eberlane Mobile Homes, petitioner was the majority stockholder and controlling individual in each of these companies. His principal occupation in the latter years has been as president of Eberhart Steel Products, Inc. Petitioner is apparently an industrious individual who has enjoyed a high degree of financial success in his business ventures. His tax returns from over the years include income derived from real estate rentals and royalties from patents *291 and oil wells, as well as substantial salaries or wages in some years. During the 1960's petitioner purchased three farms and engaged in farming on a large scale. At least as far back as 1947, petitioner began lending money to various individuals and corporations. These loans have ranged in amount from as little as $100 to as much as $200,000. Excluding the loans at issue herein, petitioner submitted a schedule of 58 loans totaling $944,021.01 that he made in the 26-year period from 1947 through 1972. Nine of these loans, totaling $406,000, were made to the corporations which petitioner controlled. Petitioner made no loans in four years during this period, but he made as many as seven loans in two different years. Petitioner's loan record for 1963 through 1972 is summarized below: [1] Year
Number of Loans
Amount
1963
7
$112,400
1964
4
43,900
1965
2
70,500
1966
2
600
1967
0
-0-
1968
1
5,000
1969
0
-0-
1970
1
42,500
1971
2
4,500
1972
2
11,000 The seven loans in 1963 included two loans to Eberhart Steel Products, Inc., totaling $75,000; *292 a single $200 loan to an individual; and four loans totaling $37,200 to Kenneth Zook, Zook Builders, Inc., and Zook Realty, Inc.
The four loans in 1964 included one loan of $20,000 to Eberhart Steel Products, Inc.; one loan of $300 to a relative; one loan of $20,000 to Edmonds Manufacturing Corporation; and another loan of $3,600 to Zook Realty, Inc.
The two loans in 1965 included one to an individual for $500, and one of $70,000 to an individual involved in the Federal highway construction business. The two loans in 1966 were each of $300, one to a relative and one to another individual. Petitioner made no loans during 1967 or 1969. The loans made in 1968 and 1970 became worthless in 1971, their nature is in dispute herein, and we shall discuss them more fully infra. The two loans in 1971 were both made to petitioner's corporations: $4,374 to Eberhart Steel Products, Inc., and $126 to Mishawake Tool and Die Corporation. The two loans in 1972 included a $6,000 loan to Eberhart Steel Products, Inc., and a $5,000 loan to Rishell Development Co. From 1958 through 1971, petitioner returned interest income from non-bank sources ranging from $943.73 in 1962 to $18,728.47 in 1968. *293 Some of the sources of interest income returned are not included on the schedule of loans which petitioner introduced, and, likewise, the schedule of loans includes several from which no interest income was reported. Nevertheless, petitioner testified that it was his custom to always charge interest on any loans that he made, [2] and to take whatever security was available. Petitioner further indicated that he kept a ledger detailing his lending activities, but it was not introduced into evidence. Finally, petitioner testified that he had a reputation in the community as a money-lender and that he spent many evenings interviewing loan applicants in his office-at-home. In 1968 petitioner was approached by David Dull, the owner of Cascade Corporation, who was *294 in need of cash to obtain the release of several travel trailers and truck campers from another manufacturer. On November 29, 1968, petitioner loaned Dull $5,000. He received in exchange for his check a demand promissory note bearing interest at the rate of 8 percent per annum, signed by both Dull and his wife, and, as security for the note, four certificates of origin for the items to be released. The debt became worthless during 1971, when Dull became a bankrupt. On August 14, 1970, petitioner and his wife acquired, for $10,000, 50 percent of the stock of Stutz-Bearcat, Inc. They became president and secretary-treasurer, respectively, of the corporation. The remaining 50 percent of the corporation's stock was deposited in escrow under an agreement by which petitioner's attorney obtained authority to vote the shares, and petitioner obtained authority to return to the other shareholder only that portion of ownership interest as petitioner should determine if Stutz-Bearcat, Inc., became a successful venture. The sequence of events between August 1970 and February 1971, when Stutz-Bearcat, Inc., was placed in bankruptcy, which included petitioner's pledging a $100,000 certificate *295 of deposit and exchanging position with a bank with respect to certain corporate assets held by the bank as collateral, is left somewhat unclear on the record. Nevertheless, between November 6 and 16, 1970, petitioner made direct loans totaling $42,500 to Stutz-Bearcat, Inc., and received in return four demand promissory notes bearing interest at the rate of 8 percent per annum and payable to both petitioners. These debts became worthless in 1971, when Stutz-Bearcat, Inc., was placed in bankruptcy. On June 1, 1971, petitioner paid $3,882 to Valley Bank & Trust Co. arising out of a guaranty agreement with respect to Stutz-Bearcat, Inc., liabilities. In 1971 petitioner also paid his attorneys $2,028 for matters in connection with Stutz-Bearcat, Inc. The statement for legal services corresponding to the $2,028 payment was addressed to Stutz-Bearcat, Inc., and represented a charge for services "from August 14, 1970 through December 31, 1970." Petitioners claimed a business bad debt deduction of $53,410 in 1971, comprised of the $5,000 Dull note, the $42,500 of Stutz-Bearcat, Inc., notes, the $3,882 payment arising from the guaranty agreement, and the $2,028 payment of attorneys' *296 fees, which resulted in a net operating loss for that year. Petitioners then filed an application for a refund for the taxable year 1968 based on a carryback of the net operating loss, and it was tentatively allowed by respondent. Respondent subsequently determined that the debts which became worthless in 1971 were not business bad debts, that the allowable deduction was therefore limited to that for a short-term capital loss, and consequently no net operating loss resulted to be carried back to 1968. OPINION The principal issue in this case is whether, for petitioners, certain worthless obligations were business or nonbusiness bad debts within the meaning of sections 166(a) and (d). [3] *297 If business bad debts, they may be used to offset ordinary income in full and for carryback purposes under section 172. If nonbusiness bad debts, their worthlessness must be treated as a short-term capital loss. Business debts are defined indirectly in section 166(d)(2) as either debts created or acquired in the course of a trade or business of the taxpayer or debts the loss from the worthlessness of which is incurred in the taxpayer's trade or business. [4] *298 Petitioner contends that he was in the business of lending money during 1968 through 1971 and that the loans in issue were made or guaranteed in the regular course of that business. Respondent denies that petitioner's lending activities were sufficient to constitute a trade or business, Imel v. Commissioner,61 T.C. 318 (1973), but should we hold otherwise, submits that the loans to Stutz-Bearcat, Inc., were investment-oriented rather than in furtherance of his money-lending business. [5] *299 Although the record strongly suggests that respondent's second contention is valid, we do not pass upon it here because we agree that petitioner's lending activity did not rise to the status of a separate trade or business. Although defying definition by convenient verbal formula, it is well established that the statutory term "trade or business" bears a restricted meaning that does not embrace every activity engaged in for profit. Sales v. Commissioner,37 T.C. 576 (1961). See Whipple v. Commissioner,373 U.S. 193, 200-201 (1963). We have applied on numerous occasions an extent-of-activities test and held that a taxpayer's lending activity was simply conducted on too small a scale and with insufficient regularity to elevate that activity to the status of a separate business. E.g., Imel v. Commissioner,supra;Sales v. Commissioner,supra;Barish v. Commissioner,31 T.C. 1280 (1959). In the money-lending cases, we have also looked for other indicia of a genuine loan business: whether the taxpayer kept appropriate records and treated his loan transactions apart from his other activities; whether the taxpayer actively sought business; the amount of time and effort expended in pursuit of his lending activity; and particularly important, the relationship between the taxpayer and his debtors. *300 Zivnuska v. Commissioner,33 T.C. 226 (1959); Fuller v. Commissioner,21 T.C. 407 (1953). See United States v. Henderson,375 F. 2d 36, 41 (5 Cir., 1967). In support of his contention that he was engaged in the money-lending business during 1968, 1970, and 1971, petitioner introduced a schedule purporting to show 60 loans totaling almost $1,000,000 that he made over a 26-year period. [6] He also testified that he had a reputation in the community as one who loaned money, that he maintained an office in his home where he conferred with loan applicants often, that he spent a considerable amount of time investigating applicants to whom no loans were extended, that he charged interest at a rate in excess of the current bank rate and took promissory notes and collateral as security with respect to loans that were made, and that he and his wife maintained a ledger detailing the information pertinent to his loan transactions. Petitioners cite for our consideration Cushman v. United States,148 F. Supp 880 (D. Ariz., 1956), and Minkoff v. Commissioner,T.C. Memo 1956-269, two cases in which a money-lending business was established. In Cushman the taxpayer had made 21 separate loans to various *301 individuals from 1944 through 1951, and the court found that her lending activities during the pertinent year were "frequent and continuous, that is, extensive, varied and regular." In Minkoff the taxpayer had made over 40 loans to various individuals in a "five-year period from 1944 to 1949." These cases contain no analysis, and other than the factual conclusions, nothing that benefits petitioners' case. Despite petitioners' well-briefed argument focused on the factors important to establish a business of lending money, the record as a whole does not justify such a finding. The extent of petitioner's lending activity during 1968 to 1971 is alone sufficient to support a finding to the contrary. Imel v. Commissioner,supra.In 1968 petitioner made only the one loan that is in issue here. In 1969 petitioner made no loans. In 1970 he made only the one loan also involved here. In 1971 petitioner made two loans, both to his own corporations, one of which was for only $126. The picture is not improved by *302 expanding the time period. In 1967 petitioner made no loans. In 1966 he made only two loans, each of $300. In 1972 petitioner made two loans, one of $6,000 to one of his corporations and one of $5,000 to an unrelated company. Assuming arguendo the veracity of petitioner's assertion that he received "many requests for loans each week" because of his reputation as a money-lender, his almost total rejection of these applications is a further indication that he was not engaged in a business of lending money. We find it incredible that petitioner devoted any significant amount of time and effort during this period to pursuit of his lending activities. Although perhaps superfluous at this point, we have not overlooked the fact that petitioner reported interest income from some of his loans or that he testified that records of his loan transactions were kept. However, standing alone, this is nothing more than any prudent lender would do, whether engaged in a business or merely participating in isolated loan transactions. The absence of such behavior is much more persuasive in establishing the lack of a business than its presence is in distinguishing between a business and a number *303 of isolated transactions. We find it much more significant with respect to these items that apparently no interest income was reported from a number of the loans and that no business records were introduced for our inspection. [7] That many of the loans were made to petitioner's corporations and relatives and that many were to repeat borrowers are additional factors that weigh against characterizing petitioner's lending activity as a business. The only issue remaining is whether petitioners are entitled to a deduction for $2,028 of attorneys' fees paid in 1971. Petitioners characterize the fees as paid "for efforts in collecting the Stutz-Bearcat, Inc. notes," and assert their deductibility either under section 162 as ordinary and necessary business expenses incurred in petitioner's business of lending money, or, should we find petitioner to be an investor, under section 212. Our finding *304 that petitioner was not engaged in the business of lending money disposes of their section 162 contention. With respect to their section 212 contention, it is well established that while legal fees incurred in an effort to recover interest on a loan are deductible, fees paid to recover loan principal are not. Kurkjian v. Commissioner,65 T.C. 862 (1976); Kelly v. Commissioner,23 T.C. 682 (1955), affd. 228 F. 2d 512 (7 Cir, 1956). Petitioners' loans to Stutz-Bearcat, Inc., were made in November 1970. The statement for attorneys' fees corresponding to the claimed deduction indicates a charge for legal services rendered to Stutz-Bearcat, Inc., "from August 14, 1970 through December 31, 1970." It is patent therefore that at least a portion of the fees were not incurred for the purpose designated by petitioners. Petitioner did not testify as to the purpose of the fees nor to what efforts were made toward collecting the loans and interest. Under these circumstances, we do not think the evidence warrants characterizing any portion of the fees as incurred for the collection of interest. See Kurkjian v. Commissioner,supra, at 871. Decision will be entered for the respondent. Footnotes
1. The following chart and commentary are gleaned from the schedule of loans introduced into evidence by petitioner and from petitioner's testimony regarding some of the transactions.↩
2. For the period from 1963 to 1971, petitioner reported interest income from Eberhart Steel Products, Inc., Zook Realty, Inc., and Edmonds Manufacturing Corp.; no interest income was reported, however, on the small loans made to individuals or the $70,000 loan made in 1965. No explanation was offered with regard to the apparent discrepancies between petitioner's tax returns and the schedule of loans introduced into evidence.↩
3. SEC. 166 BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months [9 months in 1977; 1 year after 1977]. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
4. Whether the loss sustained by payment of $3,882 in discharge of petitioner's obligation as a guarantor is deductible in full against ordinary income is subject to the same conditions described here. See sec. 1.166-8(b), Income Tax Regs.↩ Consequently, we will not differentiate between it and the loss from the worthless notes.
5. "Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business." Whipple v. Commissioner,373 U.S. 193, 202 (1963). See Betts v. Commissioner,62 T.C. 536, 541 (1974), and UnitedStates v. Henderson,375 F. 2d 36, 41-42↩ (5 Cir., 1967).
6. Both parties have treated the four separate advances to Stutz-Bearcat, Inc., as a single loan, and we shall do likewise. The distinction is immaterial on the facts of this case.↩
7. We have also noed with interest that petitioners' 1965 return reflects a claim for a short-term capital loss suffered from a nonbusiness bad debt owing from Cy Bennett, an individual identified as the recipient of 5 of the 60 loans on which petitioner relies to establish his money-lending business.↩